FARMERS' LOAN & TRUST CO. et al. v. NORTHERN PAC. R. CO.,
(WISCONSIN CENT. CO. et al., Interveners.)

(Circuit Court, E. D. Wisconsin. September 30, 1893.)

1. RAILROAD COMPANIES—RECEIVERS—LEASED LINES — ADOPTION OF LEASE—
WHAT CONSTITUTES.

The appointment of receivers for a railroad system, and their taking possession of a leased line, does not of itself work an assignment or adoption of the lease so as to make the receivers liable for the stipulated rental. They have, as a general rule, a reasonable time to determine whether they will adopt the lease, or will merely pay to the lessor the net earnings of its road, subject always to the lessor's right to re-enter for condition broken. But where the lessor immediately demands of the receivers and of the court either an adoption of the lease or a surrender of the road, and against its protest a decision is delayed for several months, in order to determine which policy is expedient, then the receivers should equitably pay the full rental during the time of their possession. Especially is this true when the receivers were appointed at the request of the mortgagees, and upon their allegations that, in order to prevent ruinous sacrifices, the system must be held together, and operated as a unit. Railroad Co. v. Humphreys, 12 Sup. Ct. Rep. 787, 145 U. S. 82, distinguished.[1]

2. SAME—RENTALS—SET-OFF BY RECEIVERS.

The receivers of a railroad system cannot set off as against a claim for rentals accruing to a leased line during the receivership any cross demands alleged to have accrued to the lessee prior to the receivership, since the two claims arose in different rights.

3. SAME—INSOLVENCY OF LESSOR—PROVISIONS OF LEASE.

In such case it is immaterial that the lessor is insolvent, when the lease provides for an arbitration of the matters claimed as a set-off, and expressly declares that the pendency of such arbitration shall not interfere with the operation of the lease, and that all payments and transactions under the lease shall continue exactly as if no controversy had arisen.

In Equity. Bill by P. B. Winston, the Farmers' Loan & Trust Company, and others, against the Northern Pacific Railroad Company, for the appointment of receivers, etc. Heard on the intervening petition of the Wisconsin Central Company and the Wisconsin Central Railroad Company for payment of rental during the receivership and other relief. Petition granted.

Geo. P. Miller, for complainants.

L. D. Brandeis and Howard Morris, for interveners.

John C. Spooner, for the receivers of the Northern Pac. R. Co.

JENKINS, Circuit Judge, (orally.) On the 26th of September an order or decree was entered directing the receivers of the Northern Pacific Railroad Company to surrender the possession of the leased lines to the lessors, the Wisconsin Central Company and the Wisconsin Central Railroad Company, based upon the original petition of the lessors of the 18th of August, and their supplemental petition of the 11th of September.

The Wisconsin Central Company and the Wisconsin Central Railroad Company, the lessors, now move the court for a further order

[1] Compare New York, P. & O. R. Co. v. New York, L. E. & W. R. Co., 58 Fed. Rep. 268.

or direction upon the footing of the order of September 26th, requiring the receivers to account to and pay to the lessors rental for the leased lines during the time of their occupancy by the receivers, upon the basis of the stipulated rental in the contract.

This application is opposed by the receivers upon two grounds: First, that compensation for use is to be measured either by the net earnings during the period of use or by the value of the use to be ascertained, and not by the stipulated rental of the contract; and, second, that whereas the Northern Pacific Railroad Company has an unadjusted and disputed claim for betterments and otherwise in excess of all previously accrued rentals due from that company to the lessors, which claim is now, under order of the court, before a master for adjustment, any order of payment should be withheld until such adjustment, and the ascertained amount over and above the amount of rentals accrued before the receivership should be allowed to be set off against the amount to be allowed for the use of the leased lines during the possession by the receivers.

That we may readily ascertain the principles of law which apply to and must govern the ruling upon these questions, it is important to accurately understand the relative positions of the parties interested, and the facts upon which the contention rests.

The bill was filed by the Farmers' Loan & Trust Company as trustee for the holders of the bonds issued under various mortgages specified in the bill upon the main and branch lines of the Northern Pacific Road west of St. Paul and Ashland, and also as trustee under the collateral trust indenture of May 1, 1893, by which the floating indebtedness was to be funded upon certain personal securities lodged in trust with the trustee; and by the firm of William C. Sheldon & Co. and P. B. Winston, as stockholders and creditors of the Northern Pacific Railroad Company. The bill was filed in behalf of all other stockholders and creditors of the company who might choose to become parties thereto.

The bill declared that the Northern Pacific Railroad Company constructed and maintained its various lines of railroad, with branches and feeders, from the city of Ashland, Wis., to Tacoma, in the state of Washington, and to Portland, in the state of Oregon. It also asserts the lease from the Wisconsin Central Company and the Wisconsin Central Railroad Company under which the Northern Pacific Company operated the Central lines and the Chicago terminals of the Chicago & Northern Pacific Railroad Company, whereby, says the bill—

"The defendant, the Northern Pacific Railroad Company, has acquired important terminal facilities for freight and passenger traffic in the city of Chicago, and the ownership and control of important belt lines of railroad, furnishing connections with every trunk line entering the city of Chicago, and with the largest and most important industries located in and about that city."

The bill also informed the court that—

"All of said lines of railroad, telegraph lines, and property have been, and are now being, operated by the defendant as a unit, forming one vast rail-

way system, known as the Northern Pacific System, the maintenance of every part of which is essential to the proper operation of the remainder."

It also declares to the court its ownership of the stock of the Chicago & Northern Pacific Railroad Company to the extent of $15,100,000, being the majority amount thereof; and that to preserve valuable railway connections and terminal facilities at Chicago, acquired under the lease, and the ownership of the stock, it was essential that the interest on the bonds issued by the Chicago & Northern Pacific road, amounting to $26,180,000, should be promptly paid, the terms of the lease complied with, and that no default in either of said obligations be permitted to occur. It also appeared that the Northern Pacific Company was the owner of at least some three million of the Chicago & Northern Pacific bonds, and of the entire issue, six million, of the Chicago & Calumet Terminal Railway Company's bonds.

The bill further gave the court to understand that—

"The said railroads and property, as now held and controlled by the defendant as aforesaid, form an important trunk line, which constitute one of the most important ingredients of its value, and that its severance would result in a ruinous sacrifice to every interest in the property; and that unless this court, in view of the impending and inevitable defaults as aforesaid, will deal with the property as a single trust fund, and take it into judicial custody for the protection of every interest therein, individual creditors will assert their remedies in different courts in said several counties; that a race of diligence will result, and judgments and priorities will be attempted; that levies and attachments will be laid upon engines and cars of the defendant, which will greatly interfere with and ultimately prevent the defendant from the proper discharge of its duties as a public carrier; that the United States mails will be stopped; that the defendant will be unable to fulfill its charter duties to the government of the United States and to connecting railroads; that commerce between the several states will be interfered with; that communication between many cities, towns, and places which are wholly dependent upon said railroads will be interrupted; that serious and irreparable injury to their trade and commerce and their general prosperity will result; that divers of the lessors of the railroads now operated by the defendant as aforesaid will enforce the re-entry covenants of their leases; that the continued default of the mortgage debts will, by the terms of the various mortgages, produce the immediate maturity of all the bonds secured by the said mortgages; that a vast and unnecessary multiplicity of suits will result, and a most important and valuable property will be dismembered by the clashing decrees of many courts at the suits of separate creditors; that said property may be shielded and preserved as a valuable single trust property by adequate judicial protection, and the sums due and to become due to the defendant's bondholders and creditors secured and ultimately paid in full. But your orators aver that unless such a course is pursued, to wit, the taking of the property into judicial custody, said property will be dismantled, dissipated, and dismembered, and vast sums of money will be lost to the various creditors and stockholders of said company, and the public interests seriously affected. And your orators aver that the unity of the property and its integrity as a whole, as now held and operated, constitute one of the most important elements of its value, and that to permit its severance will result in ruinous sacrifice of every interest in said property."

It was further charged that "part of the said Northern Pacific Railroad is located in the district embraced within the jurisdiction of this court." That, of course, refers to the eastern district of Wisconsin, and could only comprehend the Wisconsin Central

lines so leased, no other part of this road lying within this district.

The prayer of the bill asks the court, among other things, to fully administer the trust fund in which the complainants are interested, consisting, says the bill—

"Of the entire railroad system, lands, and assets of the Northern Pacific Railroad, to marshal its assets, ascertain and determine the priority of liens upon each and every part of all the said system of railway. That for the purpose of enforcing the liens and equities of the holders of the demand loans and of the floating debt of the defendant, the preferred stockholders, and of the various bond and lien holders, as well as to preserve the unity of said system as it has been for years maintained and operated, and prevent the disruption thereof by separate executions, attachments, and sequestrations, the occurrence of which will be unavoidable in view of the inevitable defaults in interest which will soon occur, your orator prays that this court will forthwith appoint one or more receivers of the entire system of railroads held and operated by the defendant, and of all the equipments, material, machinery, supplies, moneys, accounts, choses in action, shares of stock, bonds, and assets of every description, and wheresoever situated, belonging to the defendant, and of all said lands and land grants, leasehold contractual rights and property belonging to the defendant, with authority to manage and operate the same; and the officers, managers, superintendents, agents, and employes of the defendant be required forthwith to deliver up the possession of all and singular each and every part of the said property over which the receivers shall be appointed, wherever situated."

Upon the prayer of the complainants the court appointed receivers of all the property of the defendant corporation, including the railways leased by the Wisconsin Central Companies, with direction to the receivers to take possession and operate the entire system. Under this order the receivers took possession and operated the entire system, including the Wisconsin Central lines and the Chicago terminals, until possession of the lines and terminals was surrendered to the Wisconsin Central Company and the Wisconsin Central Railroad Company, the lessors, by direction of this court, on the 26th of September, 1893.

Within three days after the filing of the bill and the appointment of the receivers, the lessors, the Wisconsin Central Companies, applied to this court by intervening petition, praying—First, for payment by the receivers of rentals accruing under the lease prior to the receivership, and in accordance with the terms of the lease; and, second, that the receivers be directed to apply for leave to adopt the lease in its entirety, and, failing such election, that the companies' lessors be declared entitled to resume possession of the demised premises. Upon that petition the court directed the matter to be heard on the 23d of August. On that day, at the request of the receivers, time was allowed them until the 30th of August to file answers to such intervening petition. At the adjourned day answers were filed, by which the receivers insisted that they had not had reasonable time to determine whether the interest of the trust estate required the adoption or rejection of the lease and the operation of the leased lines, and requested further time, which was allowed, against the protest of the Wisconsin Central Companies, and the receivers were required to report their determination upon the question by the 15th of September.

On the 11th of September the Wisconsin Central Companies filed their supplemental petition, alleging defaults in the payment of rental under the lease, and a re-entry upon the demised premises, and prayed the immediate restoration to them of the possession. On the 18th of September, 1893, the receivers filed their further answer and report, asserting their conclusion that it was inexpedient to operate under the lease, and recommending that the prayer of the supplemental petition of the Wisconsin Central Companies be granted, and possession restored to them. This restoration was contested by the Chicago & Northern Pacific Railroad Company, and, after prolonged argument, the court, on the 26th of September, decreed a delivery of the possession to the Central Companies of the demised premises.

These I believe to be the essential facts with respect to the possession and operation of the leased lines by the receivers upon which the determination of the question of the measure of compensation to be awarded for such possession must be determined.

The general principle by which questions of this character are to be ruled is well stated by Mr. High in his work upon Receivers, (section 273:)

"As a rule, receivers are not liable upon the covenants of the persons over whose effects they are appointed, but become liable solely by reason of their own acts. Receivers who have been appointed over a corporation, and who have accepted the trust, and taken possession of the assets, do not thereby become liable for the rent of the premises held by the company under a lease, nor can they be held liable until they elect to take possession of the premises, or until the doing of some act which would in law be equivalent to such an election. But when a receiver enters upon and occupies premises which had been leased to a corporation over which he is appointed, he thereby becomes liable for the rent due under the lease, the liability in such case being the common liability of the assignee of a lease, and not for the debts due from the corporation; and in such a case, the facts being undisputed, it is proper for the court to direct the receivers to make payment to the lessor without a reference to determine the matter."

There appears to be no dispute with reference to that general principle as announced by Mr. High. It is restated by the supreme court in perhaps stronger and more emphatic terms in the case of Oil Co. v. Wilson, 142 U. S. 313–322, 12 Sup. Ct. Rep. 235, in these words:

"The receiver did not simply, by virtue of his appointment, become liable upon the covenants and agreements of the railway company. Upon taking possession of the property he was entitled to a reasonable time to elect whether he would adopt this contract and make it his own, or whether he would insist upon the inability of the company to pay, and return the property in good order and condition, paying, of course, the stipulated rental for it so long as he used it."

In other words, when the court, upon the petition and at the prayer of the complainant, appoints receivers, who are directed to take possession of the leased lines of railway operated in connection with the main line, such receivers take by order of the court, and do not, therefore, by the mere act of such possession, become assignees of the term; they having, so to speak, a breathing space to determine whether or no they will assume the cove-

ñants of the lease. This is because of the necessities of the case. There is no other person to take immediate possession from an insolvent corporation in the interest of the public; and as, because of the public nature of the enterprise, the road must be kept a going concern, the performance of the duties of common carrier must not be permitted to be interrupted, the mails of the government must be transported, therefore temporary possession is allowed to be taken, and, as a general rule, compensation for such possession must be measured by the terms of the instrument under which such possession was originally acquired and held. But that possession does not ordinarily operate to render the receivers assignees of the term. ·Undoubtedly there are exceptions to the rule, arising because of the peculiar circumstances of the cases, which equitably require the application of a different measure of compensation. Such an exception I consider to be the case of Railroad Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. Rep. 787, which is urged upon the attention of the court as determining a different rule.

In order to ascertain whether that decision is pertinent and binding here, the facts of that case need to be carefully considered. The Wabash, St. Paul & Pacific Railroad Company, on the 27th of May, 1884, filed its bill, making defendants various parties interested in the lines of the Wabash Company as lienors, mortgagors, or trustees under deeds of trust covering the lines or portions of them, including the trustees of the general mortgage and the Quincy Railroad, lessor to the Wabash Company. The Wabash Company asked that possession should be taken of this road and these leased lines, and that they be operated by the receiver until such time, as to the leased roads, as he should elect with reference to the adoption of the leases in order to the protection of the interests of all concerned.

On the 29th of May, before the receivers took possession, and on the 26th of June following, they petitioned the court for advice with respect to the payment of interest on the bonds of the Quincy Company, which, by the terms of the lease, the insolvent company was required to pay. The receivers notified the court that the operation of the road has not sufficed to pay its operating expenses and the cost of maintenance, and interest upon the bonds. An order was made upon that petition that, until otherwise directed, the receivers should keep account of the earnings, and as to the lines which had not earned the interest, including the Quincy Company, that the receiver should make report thereof quarterly, showing the income upon each of the leased lines. On the 16th of December following, the Quincy Company intervened by petition, setting forth that it had no means to pay the interest on its mortgages; that there had been default, and that there would result foreclosure if the default should continue; that it could not obtain payment of the Wabash Company; and it prayed that that interest might be paid out of the funds of the Wabash Company in charge and under control of the court or its receivers, or that the court order that the lease be transferred to another

railroad company, which company would pay the interest coupons in arrears, and would give security to pay accruing interest.

Upon that petition it was ordered that if, within 60 days, the St. Joseph & Quincy road should pay the interest, and would assume by proper agreement the liabilities and obligations to be performed by the lease, then the lease should become assigned and vested in the St. Joseph Company free from any right of the Wabash Company. That was never done. On April 16, 1885, the receivers prayed order with respect to the future operations of the leased lines, and concerning the payment of the respective rentals which the Wabash Company had agreed to pay, upon which the court ordered that, where a subdivision earned no surplus, simply paid operating expenses, no rent or subdivisional interest will be paid. If the lessor or the subdivisional mortgagee desires possession or foreclosure he may proceed at once and assert his rights. While the court will have to operate such subdivision until some application be made, yet the right of a lessor or mortgagee, whose rent or interest is unpaid, to insist upon possession or foreclosure, will be promptly recognized.

Afterwards, on the 15th of July, 1885, upon demand of the Quincy road, it obtained possession by order of the court. Subsequently a decree of foreclosure of the property of the Wabash Company was enforced, and the proceeds of the sale were paid into court. An application was then made by the Quincy road that the court should order out of the proceeds of the Wabash property the payment of the rental on the Quincy line accruing during the receivership, and according to the terms of the lease.

The court, in determining the question, referred to the case of Oil Co. v. Wilson, quoting from the opinion of the court the expression to which I have adverted, and asserted an approval of the doctrine that, as between the mortgagees invoking the interposition of the court and the lessor, the agreed rental was the proper payment to be made for the use of the rolling stock under the particular contract there in question; but say, as to the case then before them, that there was no resistance by the receivers, or impediment interposed by them to the re-entry of the Quincy Company, that the receivers did not remain in possession, nor were they authorized by the court to so remain as to render the lessor unable itself to resume possession. The lease gave the Quincy Company the option to re-enter, and put an end to it upon default in payment of rental continued for 30 days; that if the appellants, the Quincy Company, had applied to the circuit court for possession of the property earlier than they did, the court, in view of the case disclosed by the record, would not have declined to hand it over; that when the company applied for possession it did not avail itself of the order of the court; that subsequently, on a renewed application, the company retook its road, freed from any liability for the enormous preferential indebtedness of the Wabash Company, and with its public duty discharged up to that time by the receivers at a loss of more than $20,000; and that the lease had not theretofore been canceled by the court,

because it was considered that that ought not to be done without the assent of the lessor. The court concluded upon those facts that the receivers did not become so committed to the terms of the lease as by reason thereof to be subjected to an obligation requiring the rental to be paid out of the property of the Wabash Company in preference to the payment of the mortgagees of that property; and they say that the rental was not an expense originating in the process of administration by the court, and the road was surrendered as soon as the lessor would take it. Nor did the mortgagees consent to have the claim charged upon the corpus of the property in preference to their mortgages, and therefore there were no equitable grounds upon which the Quincy road was entitled to a preference in the distribution of the proceeds of the sale of the mortgaged property.

There is, I think, a manifest distinction between that case and the one at bar. There the lessor—the inactive lessor—sought to obtain preference over a mortgagee not applying for the receiver, a lessor who sought to obtain rental pursuant to the terms of the lease, when he was a party to the suit, and could have asked and would have received possession, but allowed the road for a long time to be operated by the receivers, knowingly at a loss. Here possession of these leased lines was asked for by the trustee of the mortgages. The court was asked by the trustee to take possession of this leased line, and operate it in connection with the main line of the defendant company, as a unit, and to keep and maintain in its integrity and operate the entire system of roads from Chicago to the Pacific. In other words, as plainly as language could state it, the trustee, the Farmers' Loan & Trust Company, asked the court to adopt this lease, and to enter into possession and operate it in the interest of the bondholders.

In the Quincy Case the bill was filed by the insolvent company. It was unable longer to continue the operation of the road, and petitioned the court, in the interest of every one interested, as well as in its own interest, to take possession of the leased lines; and the lessors were parties to that suit. And the lessors, under those circumstances, without application to the court for possession, allowed the road to be operated from May 29, 1884, to July 15, 1885, by the receivers, at a loss to its knowledge, and without the slightest attempt to obtain possession. It could well have been held in that case that such action or nonaction of the lessor would be held in equity to be an assent to the operation of that line by the receivers.

But here possession was not only taken at the request of the trustee of the mortgage, upon the assertion that the severance of the trunk line to Chicago would result in ruinous sacrifice, but it has been continued against the continued protest of the lessors, who almost from the date of the filing of the bill have sought to compel the receivers to determine whether or no they will maintain possession, adopting the lease, and, if not, that possession should be surrendered to the lessors; and also, when delay became inevitable, by the demand and act of re-entry they put themselves in the legal

position where they could lawfully require the surrender of the premises, unless the court should, upon principles of equity, remove the forfeiture, and allow the possession to continue in the receivers, adopting the lease and paying all past due rentals.

So that here the lessors have been continuously knocking at the door of the court demanding possession of the demised premises, and possession has been withheld from them against their consent, and against their protest.

It appears to the court that under such circumstances it would be inequitable to say that the court or its receivers should hold possession of the demised premises, refusing to pay rent accruing before the receivership, taking from the lessor their estate without their consent, express or implied, and saying to them: "While we take and withhold that possession until it shall be satisfactorily determined whether it is profitable or not to operate the road, you, the lessee, shall not have your rental pending that determination according to the stipulation of the lease under which possession was taken." This possession was held that it might be resolved whether, in the interest of the bondholders and creditors of the Northern Pacific road, it would be expedient to operate the leased line. It was so taken at the request of the trustee representing the bondholders, and at the request of the creditors of the road. Under those circumstances, I perceive no reason why the general rule should not prevail, and no equity to take it from without that rule. I see no reason, if this leased road has been operated at a loss, as was asserted in general terms by the receivers, that that loss should not be visited upon those at whose request possession was taken, rather than that they should be permitted to experiment with the property of another, without paying that other the stipulated rental of the lease under which their insolvent debtor had possession, and through whom, and through whom alone, the trustee and the general mortgagees could have obtained possession.

The court therefore holds, upon the facts here disclosed, for the occupation of this road by the receivers, compensation must be paid, measured by the stipulations of the lease.

As to the second question:

The Central Companies, under the stipulations of the lease, were entitled to receive from the Northern Pacific Railroad, for unpaid rental of the Central lines up to the time of the receivership, about $475,000. The receivers concede substantially that this is so, but they have alleged an offset against that rental to an amount somewhat near a million of dollars. That claim and offset is denied, and the matter was heretofore referred to a master to determine it, and is now pending before him. The receivers now ask to set off so much of that claim as will satisfy the sum that may be due for compensation by reason of their possession of the premises. Of the amount of offset claimed, about $156,000 is for equipment under article 11 of the lease; about $33,000 is for rentals under article 16 of the lease; and about $414,000 is for betterments and improvements under article 19 of the lease. If those amounts should be deducted from the claim in offset, there would not exist more than

enough, if the claim should be sustained, to satisfy the amount of rentals accruing prior to the receivership.

The principle upon which courts of equity act in respect to the matter of offset is perhaps well stated by Mr. Justice Story in Dade v. Irwin's Ex'r, 2 How. 383. "It is clear," he says, "that courts of equity do not act upon the subject of set-off in respect to distinct and unconnected debts, unless some other peculiar equity has intervened calling for relief; as, for example, in cases where there has been a mutual credit given by each upon the footing of the debt of the other, so that a just presumption arises that the one is understood by the parties to go in liquidation or set-off of the other." See, also, Greene v. Darling, 5 Mason, 201; Gordon v. Lewis, 2 Sum. 628; Id. 143; Manufacturing Co. v. Armstrong, 34 Fed. Rep. 94. There have been many adjudications to the like effect, and establishing the same principle. It has been held that in equity a debt cannot be set off against another if they are in different rights, as, for example, a demand in the character of a trustee or executor cannot be set off against a debt due from the trustee or executor personally, although the executor gives evidence to show that he is in fact personally benefited and entitled to the amount which is due to him in the character of executor.

In one case A. was the executor and trustee of a fund as to a moiety of which he was entitled beneficially. The fund was in the hands of B., who died insolvent. It was held that A. could not set off the debt to the trustee against a debt due to B.; in other words, that the claim and offset must exist in the same right. It could not be permitted that a receiver of a railroad who had purchased supplies for the purpose of operating the road should be allowed, when called upon for payment, to set off against that obligation a debt due from the seller of the supplies to the company of which he was receiver. It would be manifestly inequitable, especially if that claimed debt were disputed and unliquidated.

"The mere existence of cross demands," says the vice chancellor in Dodd v. Lydall, 1 Hare, 337, "does not of necessity give a right of equitable set-off; and certainly the mere pendency of an account out of which a cross demand may arise will not confer such a right."

It was decided in Rawson v. Samuel, Craig & P: 178, that in a case of cross demands arising out of transactions not necessarily connected with each other, a court of equity is bound to look into all the circumstances of the case, and see whether an equity is made out for blending the two matters together at the expense of possible delay in concluding one of these matters. That was where the claim arose under the same right; but the equitable claim of set-off here asserted arose in favor of the Northern Pacific road against the Central Companies, and is sought to be set off against an acknowledged claim of the Central Companies against the receivers for the use and occupation of its property by the receivers under order of the court. There is a decision in Osgood v. Ogden, 3 Abb. Dec. 425, which perhaps throws some light upon the principles by which the question is to be determined. A receiver of an insolvent corporation, suing on a cause of action on which the company itself

could not have sued, to set aside a transfer, or recover back payments made in fraud of the creditors of a corporation, represents the creditors, and not the corporation, and the defendants were not permitted to interpose as a set-off a claim against the corporation.

Treating this as a suit by the Central Companies against the receivers for use and occupation, the receivers represent, not the Northern Pacific Railroad Company, but the creditors of that company, and, under that authority, could not be permitted to set off a claim in favor of the Northern Pacific Company against the Central Companies. In Otis v. Shantz, 55 Hun, 603, 8 N. Y. Supp. 293, —and the same principle is asserted by James v. McPhee, 9 Colo. 486, 13 Pac. Rep. 535, and Beeler v. Turnpike Co., 14 Pa. St. 162,— it was ruled that a creditor who purchases goods from an assignee for the benefit of creditors cannot set up in the way of counterclaim, in action for the price, any matters which accrued against the debt, or before its assignment. So, in the case of Cook v. Cole, 55 Iowa, 70,[1] one who had rendered legal services to the corporation, been employed by its officers during the pendency of an action for the appointment of a receiver of its property, and before the property passed under control of the receiver, was held to be entitled to set off the value of such services against an account due by him to the corporation, and which so accrued prior to the receivership, but not against a further account which accrued during the administration of the receiver. In other words, underlying all these cases is the principle of equitable set-off, that it must exist and arise out of the same right, and not out of the right of another. Duncan v. Lyon, 3 Johns. Ch. 351. One would not be permitted to set off against a claim arising between one in a representative capacity and himself the debt due by the estate represented to himself. Nor would an executor, or other trustee, be permitted, as against a claim which he had originated, and owed to another, to offset a debt due by that other to his cestui que trust. They arise out of different rights, and are not the subject of equitable set-off, unless there be circumstances which control the general rule, and equitably require such set-off. It is stated here, and it may be assumed, perhaps, from the petition filed, that the Central Companies are insolvent. It at all events appears that they are insolvent in the sense that they are unable to meet their obligations as they mature. Whether they are or are not insolvent in the sense of being bankrupt is a question upon which the court has no information. But is the fact of insolvency of itself a sufficient equity to authorize the court to exercise its equitable powers to compel a set-off? Lockwood v. Beckwith, 6 Mich. 168. It is here asserted that one-half part of the claim sought to be set off arose under and in execution of the provisions of the lease. The twenty-eighth article of that lease contemplates that any claim arising under the lease should be determined in a particular way. But it was expressly stipulated in the instrument that no controversy with respect to any matter arising under the contract should be allowed to interfere with the operation of the lease pending the arbitration which the contract

[1] 7 N. W. Rep. 419.

provided should be had, and until an award should be made by the arbitrators upon the controversy. All settlements and business and payments to be transacted or made under the terms of the lease should continue to be transacted and made in manner and form existing prior to the arising of such questions, and as if no such controversy had arisen. The Northern Pacific Railroad, continuing in possession of its property and of these leased lines, could not, as against the rentals, have set off the unarbitrated and disputed claims here asserted. It was expressly provided that they should not be considered or deemed as set-offs while unliquidated and undetermined. The case is therefore withdrawn from that equitable consideration that sometimes prevails where the one party has incurred indebtedness upon the faith of, and in dependence upon the offsetting of, the claim against the other.

These receivers, with respect to their use of this road, can stand in no better plight than the Northern Pacific Railway Company. If they have the right to offset any claim of the Northern Pacific road, they can only offset it under the terms and provisions of this lease; and that lease denies the right so to offset against rentals disputed and unadjusted claims.

It appears to me, therefore, that the offset claimed ought not to be permitted to interfere with the payment for use and occupation by the receivers. By the terms of the lease, the rentals are not payable until 60 days after they have accrued. It is reported to the court that the receivers have set aside, under a previous order of the court, the percentage of gross earnings required by the lease as rental to the lessors, and that a portion of the earnings has not been collected, and cannot be for some time to come.

The order will therefore be, with respect to compensation for use of the Wisconsin Central lines proper, that compensation for such occupancy by the receivers be measured by the stipulated percentage of gross earnings stated in the lease; that the set-off be not allowed; and that the receivers of the Northern Pacific Railroad from time to time pay to the receivers of the Wisconsin Central Companies the proportion of gross earnings which under the lease is reserved as compensation, less a rebate of interest at the rate of 6 per cent. per annum from the time of the payment until maturity, as stipulated in the lease.

Any question under the lease with respect to the possession and operation of the Chicago & Northern Pacific road is reserved.

NOTE. See U. S. Trust Co. v. Wabash W. Ry. Co., 150 U. S. ——, 14 Sup. Ct. Rep. 86, decided November 20, 1893.