AMES et al. v. UNION PAC. RY. CO. et al.

(Circuit Court, E. D. Nebraska. March 29, 1894.)

1. RAILROAD COMPANIES—RECEIVERS—ASSUMPTION OF CONTRACTS.

Receivers of a lessee railroad company are not bound, merely by virtue of their appointment, to perform the obligations of all its executory contracts and leases; but they have a reasonable time in which to determine whether they will assume or renounce them. And in the case of a great system like that of the Union Pacific Company, where numerous contracts are to be examined, and a determination reached in respect to each of them, a delay of 65 days before renouncing a lease is not unreasonable.

2. SAME.

Nor does the continued operation by the receivers of the lessee of a leased road during the reasonable period in which they are coming to a determination impose upon them the obligation to perform, for this period, the company's contract guarantying interest on the bonds of the lessor.

**3. SAME—LEASED ROADS—APPOINTMENT OF SEPARATE RECEIVERS.**

Where the chief consideration moving to the lessee company is that the road of the lessor shall be operated in harmony with and practically under the supervision of the lessee, the appointment of a separate receiver for the lessor of the leased road, and his assumption of independent possession and control, operates as a withdrawal of the consideration, and of itself is sufficient to justify the receivers of the lessee company in renouncing the lease from that time.

**4. SAME—APPOINTMENT IN DIFFERENT DISTRICTS—JURISDICTION.**

The receivers of a railroad system must report to and be governed by the circuit court sitting in the district of their original appointment, in all matters relating to their general management of the trust, their general accounting, and the general operation of the road within the circuit. But the circuit court sitting in the other districts, where the same receivers were afterwards appointed, have jurisdiction to determine the validity and amount of claims of citizens thereof against the receivers and the corporation; and citizens of one district will not be required to go into another district to assert their claims.

This is a bill filed by Oliver Ames, 2d, and others, against the Union Pacific Railway Company and others, for the appointment of receivers, etc. The cause is now on rehearing in respect to certain questions on which conflicting decisions were rendered by this court while sitting for the district of Nebraska and for the district of Colorado, respectively. For the latter decision, see 60 Fed. 674.

John M. Thurston, Willard Teller, and John C. Cowin, for receivers of the Union Pac. Ry. Co.

Henry W. Hobson and A. E. Pattison, for receiver of the Union Pac., Denver & G. Ry. Co.

Before CALDWELL and SANBORN, Circuit Judges.

SANBORN, Circuit Judge. January 11, 1894, the United States circuit court for this circuit, sitting at Omaha, in the district of Nebraska, confirmed the election of the receivers of the Union Pacific Railway Company to renounce and disregard the executory provisions of the traffic agreements of April 1, 1890, and July 5, 1893, between that company, hereafter called the "Pacific Company," and the Union Pacific, Denver & Gulf Railway Company, hereafter called the "Gulf Company," and held that the receivers, while in possession and management of the property of the Pacific Company, under the orders of this court, were not bound by these provisions. February 8, 1894, the circuit court for this circuit, sitting at Denver, in the district of Colorado, held that the receivers of the Pacific Company were bound by and subject to, and ordered them to comply with, all the provisions of these contracts, except those relating to the payment of compensation for the services that should be rendered under the contracts of April 1, 1890, and July 5, 1893. The payment of this compensation was suspended by order of the court, and it was ordered that the amount thereof should be subsequently determined by the court, after the report of a master, who was appointed to ascertain the proper amount, should be filed with the court. Applications for a rehearing of the petitions upon which these orders were based were filed in each of the districts of Nebraska, Colorado, and Wyoming, and the petitions ordered to be

reheard before us at Omaha. The matters presented by these petitions have now been heard, and we proceed to state the result at which we have arrived.

October 13, 1893, by order of this court, sitting in the district of Nebraska, S. H. H. Clark, Oliver W. Mink, and E. Ellery Anderson were appointed receivers of the Pacific Company, the Gulf Company, and many other railroad companies, that under leases, traffic, and other arrangements had been operated by the Pacific Company, and that together formed that great aggregation of railroads called the "Union Pacific System." The petition on which these receivers were appointed alleged that the Pacific Company was insolvent. November 13, 1893, the attorney general of the United States filed a petition in this court, in which he prayed on behalf of the government that two additional receivers be appointed to represent the interest of the United States in the management of this property, and by order of this court John W. Doane and Frederick R. Coudert were appointed additional receivers to co-operate with those already appointed. We do not now seek to state the indebtedness of the company, or to marshal its liabilities. It is sufficient that it appears from the petitions on file that the railroad of the Pacific Company proper, comprising about 1,800 miles, with the lands and property appurtenant to it, is incumbered by liens on various parts of it, aggregating more than $117,000,000. By an agreement dated April 1, 1890, and a supplemental agreement dated July 5, 1893, the Pacific Company and the Gulf Company covenanted with each other that the lines of railroad they owned or controlled or should thereafter control should be operated as one continuous line, in harmony with each other, and never in hostility or antagonism to each other, or in the interest of any other line or road to the injury of either; that switching between the parties at all connecting points should be free; that all traffic and travel to and from the east to and from Denver should pass over the line of the Gulf Company between Julesburg and La Salle, except that which comes and goes by way of the Kansas Pacific; that the earnings from the business passing over any part of the lines of both should be divided, in the first instance, in proportion to the distances actually hauled by each, except that neither party should be required to accept a less proportion in the division of any joint rate than 20 per cent.; that the Gulf Company would maintain and operate its roads in good working order, and keep them fully equipped; that it would apply all of its net earnings to the payment of the interest on its first mortgage bonds, and the balance, if any, to the payment of dividends on its stock; that the Gulf Company would join with the Pacific Company and the Denver, Leadville & Gunnison Railway Company to erect shops for the joint use of said companies in the city of Denver, at an expense of not less than $500,000; that the Pacific Company would guaranty the payment of the coupons upon the first mortgage bonds of the Gulf Company, and, in case the net earnings of the latter company were insufficient to pay the same, the Pacific Company would so change the basis of the division of the earnings specified in the said agreement that the Gulf Company should re-

ceive therefrom a sufficient income to pay the interest on its first mortgage bonds, and its taxes. The original agreement contains this provision:

"It is expressly understood and agreed that the covenants and agreements herein, so far as the same relate to a division of the earnings and the basis of such, are strictly covenants and agreements between the parties hereto, and none of the covenants and agreements herein on the part of the party of the second part [the Pacific Company] are intended to create, nor shall the same be construed to create, or be a mortgage or pledge, legal or equitable, of the earnings of the party of the second part for any purpose whatsoever, and nothing herein contained is intended, nor shall the same be construed or held, to affect any duty or obligation on the part of the party of the second part to the government of the United States under its charter or any act of congress."

The first mortgage bonds of the Gulf Company referred to in this agreement bear date December 1, 1889, and are payable 50 years from that date. Pursuant to said agreement, the Pacific Company indorsed its guaranty of the payment of the coupons upon each of these bonds. The bonds amount to $15,714,000, and the interest coupons upon them amount to more than $750,000 per annum. The earnings of the Gulf Company upon the basis of division first named in the agreement fall short of an amount sufficient to pay its operating expenses, taxes, and the interest on its first mortgage bonds by more than a million dollars per annum, and in order to comply with these contracts the receivers of the Pacific Company must take from the net earnings of that company more than a million dollars per annum, and pay it into the treasury of the Gulf Company. If this is done, the income of the Pacific Company will be insufficient to pay its operating expenses and to meet its other obligations. The receivers took possession of and operated the railroads of the Gulf Company under the orders of this court until December 18, 1893. December 12, 1893, an order was made by this court, sitting at Denver, in the district of Colorado, upon a bill which had been filed in that court by one John Evans on the 12th day of August, 1893, appointing Frank Trumbull receiver of the Gulf Company, and directing the receivers of the Pacific Company to surrender and deliver to him all the property of the Gulf Company. This they did December 18, 1893. January 15, 1894, they notified the receiver of the Gulf Company that they renounced the benefits of, and would not undertake to perform the obligations of, the Pacific Company under the agreements of April 1, 1890, and July 5, 1893. January 27, 1894, they notified the receiver of the Gulf Company that they would no longer run their trains over its line from Julesburg to La Salle. For the purposes of this hearing these contracts will be treated as valid agreements of the contracting parties. The covenants of the Pacific Company contained in these agreements do not run with or bind any of its real or personal property, and what is said in this opinion has no reference to contracts or covenants that do. It is well settled that the receivers of an insolvent railroad corporation, appointed by a court of chancery to preserve its property and operate its railroads, do not stand in the shoes of the corporation. They are neither the representatives of the insolvent

corporation nor of its creditors or stockholders. They are the officers and representatives of the court, the hands of the court, in which it holds the property while it operates the railroads of the insolvent corporation for the benefit of those ultimately entitled to the property and the income. The court is not bound to pay the debts nor to perform the obligations of the insolvent, nor are its receivers. No one ever contends that the obligations of the insolvent corporation to pay its debts are assumed by its receivers. The only difference between the liability of such receivers to pay the debts and their liability to perform the executory contracts of an insolvent corporation is that the consideration of the former is generally received by the insolvent, while the consideration of the latter may be obtained by the receivers; and if, for an unreasonable length of time, they accept the benefits, they may thereby assume the liabilities of such contracts. The possibility of such an assumption of liability imposed upon these receivers a corresponding duty. This duty was to carefully examine every lease, traffic, or other executory contract of the Pacific Company, and to determine in each case whether or not it was for the best interest of all the creditors and stockholders of the insolvent corporation, for, whose ultimate benefit they held its property, that they should accept the benefits and assume the burdens of such lease or contract. They were entitled to a reasonable time after their appointment to make this examination and determination. They were appointed October 13, 1893. They renounced these contracts January 15, 1894. In view of the great number of executory contracts the Pacific Company was a party to, and the heavy interests involved in this receivership, this was not an unreasonable time, in our opinion, to use in the examination and determination of this question. Moreover, we think the chief consideration for the assumption by the Pacific Company of its liabilities under these contracts was that the Gulf Company should be operated in harmony with and practically under the supervision and control of the Pacific Company itself. December 12, 1893, a separate receiver of the Gulf Company was appointed, who on December 18, 1893, took from the receivers of the Pacific Company the possession and control of the property of the Gulf Company. This receiver has since operated the railroads of the Gulf Company free from the supervision and control of the receivers of the Pacific Company, and has thus withdrawn from them that consideration. This of itself is, in our opinion, a sufficient reason why the receivers of the Pacific Company should not be required to perform the covenants of that company contained in these contracts subsequent to December 18, 1893. Specific performance of such contracts as these cannot be enforced against receivers who have not assumed the obligations therein by any word or act of their own, because, as was well said by Mr. Justice Swayne in Express Co. v. Railroad Co., 99 U. S. 191, 200:

"A specific performance by the receiver would be a form of satisfaction or payment which he cannot be required to make. As well might he be decreed to satisfy the appellant's demand by money as by the service sought to be enforced."

The result is that these receivers were not bound by the covenants and obligations of the Pacific Company contained in these contracts by virtue of the order appointing them. They had the option within a reasonable time after their appointment to accept these leases and assume these obligations, or to renounce the former and refuse to be bound by the latter. They exercised this option within a reasonable time, and wisely renounced the contracts. In support of our views in this case we refer to the following authorities: Express Co. v. Railroad Co., 99 U. S. 191; Quincy, M. & P. R. Co. v. Humphreys, 145 U. S. 82, 96, 12 Sup. Ct. 787; St. Joseph & St. L. R. Co. v. Humphreys, 145 U. S. 105, 113, 12 Sup. Ct. 795; U. S. Trust Co. v. Wabash W. Ry. Co., 150 U. S. 287, 14 Sup. Ct. 86; Central Trust Co. v. Wabash, St. L. & P. Ry. Co., 23 Fed. 863; Central Trust Co. v. Wabash, St. L. & P. Ry. Co., 34 Fed. 259; Farmers' L. & T. Co. v. Northern Pac. R. Co., 58 Fed. 257, 266; New York, P. & O. R. Co. v. New York, L. E. & W. R. Co., Id. 277, 280, 281.

In Quincy, M. & P. R. Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, the Quincy, Missouri & Pacific Railroad Company was being operated in the year 1884 by the Wabash, St. Louis & Pacific Railway Company, under a lease for 99 years, made in 1879, by which the Wabash Company undertook to pay a certain rental, including the interest on the bonds of the Quincy Company. In May, 1884, Humphreys and another were appointed receivers of the Wabash Company by the circuit court of this circuit, sitting at St. Louis, and took possession of and operated the railroads of both companies as such receivers. In June, 1884, they reported to the court that the earnings of the Quincy road were insufficient to pay the agreed rental. On January 16 and May 15, 1885, they made like reports. On April 16, 1885, the court directed: (1) "That subdivisional accounts must be paid separately." (2) "Where any subdivision earns a surplus over expenses, the rental or subdivisional interest will be paid to the extent of the surplus, and only to the extent of the surplus." (3) "Where a subdivision earns no surplus, simply pays operating expenses, no rent or subdivisional interest will be paid. * * *" (4) "Where a subdivision not only earns no surplus, but fails to pay operating expenses, as in the St. Joseph and St. Louis branch, the operation of the subdivision will be continued, but the extent of that operation will be reduced with an unsparing though a discriminating hand." Central Trust Co. v. Wabash, St. L. & P. Ry. Co., 23 Fed. 863. The receivers complied with this order, but the earnings of the Quincy Company were insufficient to pay the agreed rental. December 8, 1885, the trustees for the bond holders of the Quincy Company petitioned the circuit court to direct the receivers to pay to them the unpaid rental according to the terms of the lease for the time during which the receivers had operated the Quincy road, and to decree it to be a lien superior and paramount to all mortgages on the property of the Wabash Company. This petition was denied, and on appeal that decision was affirmed by the supreme court, although the receivers had remained in possession of and operated the Quincy road for more than six months after their appointment. Similar rulings were made by the

circuit court sitting at St. Louis upon other claims of like character against the receivers of the Wabash Company, and they have been affirmed by the supreme court in St. Joseph & St. L. R. Co. v. Humphreys, supra, and in U. S. Trust Co. v. Wabash W. Ry. Co., supra, until the opinion delivered by Judge Brewer in Central Trust Co. v. Wabash, St. L. & P. Ry. Co., 23 Fed. 863, has become an embodiment of the settled law of this country upon the questions before us. The conclusion we have reached is in accord with that opinion, and the orders for the accounting of the receivers and for the management of the various railroads in their possession in this receivership will hereafter conform to it.

In accordance with these views, the order directing the receivers to operate the Julesburg branch will be rescinded, and the receivers of the two companies will negotiate and agree upon a fair and just traffic arrangement, carefully considering the interest of the public as well as that of the real parties they respectively represent; and, if they are unable so to agree, they will submit their differences to this court, and they will be at once settled.

So far as the claim of the Gulf Company or its receiver to the amount of interest which accrued on its bonds prior to the appointment of the receivers of the Pacific Company is concerned, we are aware of no principle of law and of no equitable consideration that will take this claim out of the category of the simple contract liabilities of the Pacific Company of like date and character, or relieve it from the effect of any valid offsets or counterclaims the Pacific Company may have against the Gulf Company. This claim must be considered in the general accounting between these corporations. But the receiver of the Gulf Company insists that by operating the railroad of that company from October 13 to December 18, 1893, and by various acts and statements during that time, the receivers of the Pacific Company accepted the benefits and assumed the liabilities of these contracts for that period, and that they ought to be directed to pay at once, and in preference to all other claims, the interest on the bonds of the Gulf Company that accrued during that time. The authorities to which we have referred leave no doubt of the following propositions: First. The appointment of the receivers did not ipso facto make them liable to pay this interest according to these contracts. Second. The fact that they took possession of and operated the railroad of the Gulf Company for 65 days would not of itself establish an assumption by them of the Pacific Company's liability under these contracts, because they had the right to operate the road for a reasonable time, to ascertain whether or not it was to the interest of all the parties for whom they held the Pacific Company's property that they should assume this liability; and 65 days was not an unreasonable time to use in determining this question. Third. The burden of proof is on the receiver of the Gulf Company to establish the proposition that these receivers did assume this liability. The receivers strenuously deny that they did so. This issue is squarely made by the petitions of the parties and the arguments of their counsel. As we understand it, it involves the disposition of about $200,000. No

testimony has been taken, no witness has been examined or cross-examined on this question, but it is submitted to us, and was, as we are informed, submitted to the courts upon the earlier hearings, on allegations and denials and extracts from affidavits and statements of individual receivers and others found in the files of the courts, and generally made with no reference to this issue, but with special reference to questions entirely foreign to it. This evidence is fragmentary and unsatisfactory, and we are not satisfied from it that these receivers ever intended to or ever did assume or agree to pay the interest on the Gulf Company's bonds during these 65 days. This may be established by subsequent proof, and opportunity will be given to do so. Nor are we willing to say at this time, and in the very unsatisfactory condition of the evidence relative to the financial condition and to the accruing liabilities and income of the Pacific Company, that it would be just and equitable to the real parties in interest in this receivership to pay to the receiver of the Gulf Company now the full amount of this interest as compensation for the use of this railroad during these 65 days. It is too early in the administration of this vast trust to tell to what extent the obligations of the Pacific Company can be met by its earnings and the earnings of its constituent or allied companies. We cannot yet learn how many of the latter companies may have their traffic agreements renounced by the receivers, and may present claims for preference in payment like that before us. The payment of the receiver of the Gulf Company as a preferred creditor now, at the contract rate fixed by the traffic contract, for the 65 days the receivers of the Pacific Company operated that road, might deprive creditors of the same or a higher rank of any payment at all. For these reasons we think it is unwise at this time to require the receivers to pay for the use or operation of any of the constituent lines any larger amount than the amount those lines have actually earned. Accordingly the orders made in the Colorado district on February 12 and February 14, 1894, and the like orders made in the Wyoming district, will be rescinded. A special master will be appointed in this cause. All the claims of the Gulf Company against the Pacific Company prior to October 13, 1893, and all the claims of the Pacific Company against the Gulf Company accruing prior to that date, will be referred to him. All the claims of the Gulf Company and its receiver against the Pacific Company or its receivers which have accrued subsequent to October 13, 1893, and all the claims of the receivers of the Pacific Company against the Gulf Company or its receiver which have accrued subsequent to that date, will be likewise referred to him. He will be directed to determine the law and the facts in these controversies, and directed to report the general balance due from the Gulf Company to the Pacific Company, or from the Pacific Company to the Gulf Company, as the case may be, on account of the claims of the respective parties accruing prior to October 13, 1893. He will also be directed to report the general balance due from the receivers of the Pacific Company to the Gulf Company or its receiver, or from the Gulf Company or its

receiver to the receivers of the Pacific Company, as the case may be, on account of their respective claims accruing subsequent to October 13, 1893, and to find and report to this court what amount, if any, of the balance so found to be due, should be treated as a preferred claim by the receivers of the Pacific Company in the administration of the trust imposed upon them.

It is unnecessary to discuss or decide here whether the circuit court sitting in Colorado or Wyoming is a court of ancillary jurisdiction in the matter of this receivership. These receivers were first appointed in this court sitting in Nebraska. So far as the general management of the trust imposed upon them, the general operation of the railroad system in their charge in this circuit, and their general accounting, is concerned, they must report to and be governed by this court sitting in Nebraska. The impracticability of properly administering this great trust under any other practice, and the intolerable confusion which would result from contradictory orders regarding these subjects made in the different districts in the circuit, will commend this rule of practice to every judge within the jurisdiction, and prevent any interference or modification of the orders issued in these matters by the circuit court for the district of Nebraska, except by appeal or upon rehearing; but the circuit courts in the districts of Colorado and Wyoming have jurisdiction to hear and determine the claims of the citizens of those districts against the insolvent corporation and the receivers of it, and their determination of those matters will be equally respected by the court sitting in Nebraska. Citizens of one district will not be required to go to another district to assert their claims against receivers appointed by the courts of both districts.