CENTRAL TRUST Co. *et al. v.* WABASH, ST. L. & P. RY. Co. *et al.* (GILMAN *et al.,* Intervenors.)

*(Circuit Court, E. D. Missouri, E. D.* March 19, 1888.)

1. RAILROAD COMPANIES—INSOLVENCY AND RECEIVERS—LEASED LINES—CLAIMS FOR RENT—PRIORITIES.

The property of defendant railway company was made up of the consolidation of a number of lines, some of which were taken by purchase, and some by lease. Nearly all of these lines were subject to prior mortgages, and there was also two general mortgages on the consolidated system. Defendant filed a bill confessing insolvency, and asking the appointment of receivers to administer its assets among its creditors. The lessor companies were made defendants, and an order was made appointing receivers to operate the entire system. It was also provided that any lessor might at any time assert his right to possession of lines leased by him for unpaid rent. *Held,* that the taking possession of leased lines by the receivers did not make them assignees of the leases, so as to make the rentals due under such leases prior to the mortgages.

2. SAME.
  On the petition of the receivers of an insolvent railway system, showing
  that one branch of the system had earned more than operating expenses, an
  order was made that out of the profits of that branch the rental thereon be
  paid, until otherwise directed. *Held*, that the lessor had a right to rely on
  this order, and the receivers would be required to pay the rental from the
  time specified.

In Equity.   On exceptions to master's report.

*In re* intervening petitions of Theodore Gilman and Charles H. Bull,
trustees; Quincy, Missouri & Pacific Railway Company; George I. Seney,
trustee, and St. Joseph & St. Louis Railroad Company.

*Hough, Overall & Judson*, for Gilman & Bull, trustees, and the Quincy,
Missouri & Pacific Railway Company.

*Theodore Sheldon*, for George I. Seney.

*Pattison & Crane*, for St. Joseph & St. Louis Railroad Company.

*Wells H. Blodgett, H. S. Priest*, and *Geo. S. Grover*, for receivers.

Before BREWER and THAYER, JJ.

BREWER, J.   These are three intervening petitions, in each of which
is presented the question of liability for rentals during the receivership.
The master denied the petitions, exceptions were duly taken, and the
question is now before us on these exceptions.   The first two cases are
so nearly alike that the statement of the facts in one will bring the ques-
tion clearly before us.   In August, 1879, the Quincy, Missouri & Pacific
Railroad Company leased its road to the Wabash Railroad Company for
a period of 99 years.   By subsequent consolidations the Wabash Railway
Company became merged into the Wabash, St. Louis & Pacific Railway
Company.   The latter company, of course, succeeded to all the obliga-
tions of the former.   The conditions of the lease material to this inquiry
were substantially that the lessee would pay taxes, and keep the road in
repair, and also pay as rental a given percentage of the gross earnings,
guarantying that such percentage should at all times be equal to the in-
terest at 6 per cent. on the bonds of the lessor company issued at the rate
of $9,000 per mile.   At the beginning of the receivership the outstanding
bonds of the lessor amounted to $1,204,000.   Gilman and Bull were the
trustees in these bonds, and the intervening petition was filed by them
as well as by the Quincy Railway Company.   On the 29th of May, 1884,
the Wabash, St. Louis & Pacific Railway Company filed its bill in this
court confessing its insolvency, and praying the appointment of receivers.
This bill showed that the complainant's property was a system made up
by the consolidation of various independent lines, some of which were
taken in by lease and some by purchase; that nearly all of these inde-
pendent lines were subject to underlying and prior separate mortgages.
It also showed the two general mortgages,—one on the system as con-
solidated, and the other on terminal facilities, and certain other prop-
erties.   It averred that the value of these properties consisted largely in
the preservation of the system intact, and that to permit the breaking up
of the system by separate foreclosures of these underlying mortgages would
largely impair the value of the properties.   It made the lessor companies

party defendant. It prayed, among other things, "that after paying such claims as were required to be paid in order to prevent a forfeiture of orator's rights and interest in all rolling stock and equipments, the residue or surplus of all incomes, revenues, and earnings of said railroads, and all other assets coming into their hands as such receivers, be applied to the discharge of all debts, obligations, and liabilities of orator, according to the rights and legal and equitable priorities of all concerned as creditors or otherwise, under the direction of the court." The order appointing the receivers directed them to take possession of all these lines of road merged in this one system, and also as follows:

"It is further ordered that the said receivers, out of the income that shall come into their hands from the operation of said railroad, or otherwise, proceed to pay all balances due or to become due to other railroads or transportation companies on balances growing out of the exchange of traffic, accruing during six months prior thereto. That said receivers also in like manner pay all rentals accrued, or which may hereafter accrue, upon all leased lines of said complainant, and for the use of all terminals or track facilities, and all such rentals or installments as may fall due from said complainant for the use of any portion of road or roads or terminal facilities of any other company or companies, and also for all rentals due or to become due upon rolling stock heretofore sold to complainant and partially paid for. That said receivers also pay in like manner out of any incomes or other available revenues which may come into their hands, all just claims and accounts for labor, supplies, professional services, salaries of officers and employes, that had been earned or have matured within six months before the making of this order. It is further ordered that said receivers pay all current expenses in the operation of said road, collect all the revenues thereof, and all choses in action, accounts, and credits due and to become due to the company. That such receivers keep such accounts as may be necessary to show the source from which all such income shall be derived, with reference to the interest of all parties herein and the expenditures by them made."

In pursuance of this order the receivers took possession of the Quincy road with the other properties. On the 26th of June, 1884, the receivers filed their petition in the court asking its instructions as to how they should dispose of the earnings of certain lines, among them the Quincy road, which lines they believed did not earn enough to pay operating expenses and the rental; and on the 28th of June an order was entered as follows:

"*Third.* It is further ordered that the receivers herein, until otherwise directed, keep the accounts of all the earnings and incomes from, as well as the accounts of all the operating expenses, costs of maintenance, and taxes upon the following lines or divisions of said property, separately, to-wit."

On the 15th of October, 1884, upon the report of the master recommending that the receivers be directed to pay interest on a certain division, the court, in granting the order, made this announcement:

"*The Court.* I have stated at an early day, and Judge BREWER has gone over that matter, (and we are in accord with regard to it,) that I am not going to take the money that belongs to the underlying mortgages to pay interest on non-earning branches. If they have got to fail, they must fail. I will protect the underlying mortgages especially, and they havn't got enough here

to do it.  *Mr. Smith.* Then I ask that the matter be referred to the master, and we will introduce testimony showing the actual earnings of the road in the past three months.  *The Court.* That is the important element.  If this branch is earning enough to pay its own interest, that is another inquiry; but certainly I am not going to sit here and order that the earnings that belong to other branches in this consolidated system shall be taken to pay concerns that do not pay earning expenses.  Let them collapse."

And on April 16, 1885, after receiving the reports of the receivers in respect to several lines, the Quincy road among them, and after notice to the various parties in interest, an order was entered to this effect:

"*First.* That the subdivisional accounts must be kept separately.  'That was an order,' said the court, 'passed by Brother TREAT at the very outset of this receivership, in order that the particular equities of each one of these divisions, as between themselves, might be ascertained.'  *Second.* Where any subdivision earns a surplus over expenses, the rental, or subdivisional interest, will be paid to the extent of the surplus, and only to the extent of the surplus.  *Third.* Where a subdivision earns no surplus,—simply pays operating expenses,—no rent or subdivisional interest will be paid.  If the lessor or the subdivisional mortgagee desires possession or foreclosure, he may proceed at once to assert his rights.  While the court will continue to operate such subdivision until some application be made, yet the right of a lessor or mortgagee, whose rent or interest is unpaid, to insist upon possession or foreclosure, will be promptly recognized.  *Fourth.* Where a subdivision not only earns no surplus, but fails to pay operating expenses, as in the St. Joseph & St. Louis branch, the operation of the subdivision will be continued; but the extent of the operation will be reduced with an unsparing though a discriminating hand."

And on July 15, 1885, the court, on the application of the trustees, Gilman & Bull, made an order directing the receivers to surrender the Quincy road to them, which was done.  As a matter of fact the earnings of the Quincy road during the time it was in the hands of the receivers were insufficient to pay the operating expenses; and at the time the receivers took possession of the property, there was due by the company, of floating debts, (which, by the rulings of the supreme court, were preferential debts, and entitled to payment, prior to the mortgages,) over $3,000,000.  The gross receipts of the entire system during the receivership were insufficient to pay the operating expenses, and discharge all of this floating and preferential indebtedness; and the purchasers, in addition to the sum bid by them, have, as required by the orders of this court, paid the balance of said preferential and floating indebtedness.  The purchasers have taken possession of the property within the jurisdiction of this court, though it is true the court, in the order surrendering possession, reserved the right to retake it, if the purchasers failed to pay all claims and demands which should be adjudged prior in lien to the mortgages.  The intervenors' claim, of course, is that the rentals due them are preferential debts, and should be paid prior to the mortgages.  I believe these facts present the question fully.

We start with this fact, that prior to the appointment of the receivers, intervenors' claim was subordinate to that of the mortgagees.  It was a claim, of course, good against the income, but not against the *corpus;* at

least not good against the *corpus* until after the payment of the mortgages; and the first question is whether the action of the receivers in taking possession, or of the court in ordering possession, changed the *status*, and gives to intervenors' claim a higher position than it theretofore had. It is strenuously insisted by intervenors that it did; and they say that by taking possession of this leased property the receivers became virtually the assignees of the lease, and therefore bound by its terms, and bound to an extent which binds the property in preference to the lien of the mortgagees. A multitude of citations are made from the text-books and decided cases, to the effect that where a mortgagee institutes foreclosure proceedings, and upon his application a receiver is appointed, and such receiver takes possession of property leased by the mortgagor, such taking of possession is an acceptance of the lease, and binds the receiver as assignee, and binds so as to concede a preference to the lessor in respect to his rental. In other words: If A., a mortgagee, commences foreclosure proceedings against B., a mortgagor, and a receiver, appointed at his instance, takes possession of the property of C., leased by B., such possession of the leased property is an acceptance by the receiver of the lease, makes him an assignee of the lessee, and binds both him and A., the mortgagee, to the full amount of the mortgaged property, to the payment of the rents. High thus states the rule:

"As a rule, receivers are not liable upon the covenants of the persons over whose effects they are appointed, but become liable solely by reason of their own acts; and receivers who have been appointed over a corporation, and who have accepted the trust and taken possession of the assets, do not thereby become liable for the rent of the premises held by the company under a lease; nor can they be held liable until they elect to take possession of the premises, or until the doing of some act which would in law be equivalent to such an election. But when a receiver enters upon and occupies premises which had been leased to a corporation over which he is appointed, he thereby becomes liable for the rent due under the lease; the liability in such cases being the common-law liability of an assignee of a lease, and not for the debt due from the corporation. And in such case, the facts being undisputed, it is proper for the court to direct the receiver to make payment to the lessor without a reference to determine the matter." High, Rec. (2d Ed.) § 273.

This proposition, fortified as it is by ample citations, is conceded; but is it applicable? This receivership was upon the application of the mortgagor,—a party in possession of various properties,—some owned, some leased, and all subject to various obligations. Could the action of the mortgagor, or the decision of the court upon his application, change the relative rights of the mortgagee and the lessor? Was it in the power of the court upon the application of the mortgagor alone to charge the mortgagee with obligations to which he never assented? That this bill was filed by the mortgagor is, of course, conceded; and that its theory was not the preservation of any single creditor's rights, but that of all its creditors, secured and unsecured, is evident from these extracts from the bill:

"That all, or nearly all, of said mortgages embraced all rolling stock to be thereafter acquired by the companies executing such mortgages; but that, as such original companies and those lines of railroad have been gradually ab-

sorbed in orator's vast system, the rolling stock of said entire system has become so intermingled as to be incapable of division according to the original ownership of the said several lines of road according to said several mortgages. And any attempt to control or dispose of portions of such rolling stock by any court or courts not having jurisdiction of the whole, and not competent to deal with orator's entire property as a unit, would produce great confusion and uncertainty, and would result to great loss to all persons interested in said rolling stock, or in orator's property or securities. * * * And orator avers that the interest of the orator in said road, and of all its creditors and holders of the bonds aforesaid, are greatly imperiled by the existing prospect of the disruption of said road on the happening of the default impending as aforesaid, and the interests of all parties can only be protected by the interposition of a court of chancery. That if said lines of railroad are broken up, as aforesaid, and the fragments thereof placed in the hands of various receivers, and the rolling stock, materials, and supplies seized and scattered abroad in the manner above indicated, the result will produce irreparable injury and damage, not merely to orator, but to all persons having any interest in said lines of road, and the securities thereof."

The idea which underlies this bill is that which underlies the action of a voluntary bankrupt under the bankrupt law. Finding himself insolvent, he surrenders his property to the court, to be disposed of for the benefit of his various creditors. Such action in no manner changes the relative rights of his various creditors. They stand subsequent to this action as they did before, and their various rights and equities are determined, not by his action in surrendering his property to the custody of the court, but by the terms and obligations of the contracts theretofore entered into. Narrow the question in this way: Suppose A. is the owner of a mill and the lessee of an adjacent farm. Having mortgaged both his mill and his leasehold interest, and finding himself insolvent, he applies to the court by bill for the appointment of a receiver to take possession of his property and dispose of it for the benefit of his creditors, can it be that his action in filing the bill, or the action of the court in appointing a receiver, makes the claim for rental an unsecured obligation, paramount to the secured lien of the mortgage? The proposition will be startling, if true. It would put it in the power of a mortgagor to dispossess the vested lien of the mortgagee, and render such lien subordinate to unsecured claims. It is true that after the appointment of a receiver the mortgagee came in with an application for a foreclosure; but the assertion of his rights to a foreclosure was not different from that of the assertion of the lessor to his claim for rent. Each took what rights were given him by his prior contract, and neither by his action waived any of his rights or consented to a subordination of his priority. It is true, also, that the holder of the general mortgage prayed the court to extend the receivership over a part of the property to it as a mortgagee. Perhaps if that application had been granted, some different question might now arise; but the court expressly decided against the application, leaving the receivership to stand as it was in the first instance,—one granted on the application of the mortgagor, and one whose appointment it was believed would in no manner change the relative rights of any creditor. It may be said that the theory of the bill was novel; that sel-

dom it is that the mortgagor, the debtor, applies for a receivership. This may be true, though this is not the first instance in the judicial history of this country that such an application has been made and sustained. The New York & New England road was upon a like application placed by the circuit court of Connecticut in the hands of a receiver; and in bankrupt cases, though that was specially authorized by statute, such a proceeding was common. But the question is not now upon the propriety of the action of the court in appointing a receiver on the application of the mortgagor, but upon the effect of such action. The propriety of this proceeding was long since challenged in this court, and its opinion, with the concurrence of both judges, was in favor of its propriety and validity. That question being settled, it would seem to be logical and necessary that no action of the court at the instance of the mortgagor, no action of the receivers in direct obedience to the orders of the court, could change the relative rights of the creditors *inter sese*.

Again, if the action of the court in making the appointment, and of the receivers in taking possession, did not of itself create a new and legal obligation against the mortgagees, are there any equitable reasons why the claim of the lessor should be given priority to that of the mortgagee? The lessor was defendant as well as the mortgagee; each knew his rights; each summoned into court was at liberty to assert his rights; neither was told directly or by implication that he would gain aught by the action of the court in making the appointment. As the mortgagee might come in, and did come in, asking foreclosure of his mortgage, so the lessor might come in, and many did, demanding the surrender of the leased property for non-payment of rent. These very intervenors after the lapse of some months came in and asked possession of their property, which was promptly surrendered. Why should the mortgagee be compelled to pay the lessor any more than the lessor be compelled to pay the mortgagee? Each was summoned into court, each was called upon to make a showing of its claim, and each did so in time and manner that suited it. Because there were various properties covered by separate mortgages all merged in one system, and as such covered by one subordinate mortgage, is there any equitable reason why the court, seizing upon all of the properties at the instance of the common debtor, can be said to have created any new and different equities between these various creditors? Did not each stand upon his legal rights,—rights as they existed before the receivership, and rights which could be asserted at any time, and were in fact asserted as soon as each party saw fit? There was certainly nothing in the action of the court or the various orders made by it which gave to any party the right to expect other than his legal claims. Of course, the order in the first instance was to pay rentals out of the income, and that income, as we have seen, is all exhausted in preferential debts and operating expenses. Early in the history of receivership the order of the court was to keep separate accounts of the earnings of the different lines, and the clear intimation of all the orders and opinions, as well as the express language of many, was that the income from any property, part of the general system, would be appropri-

ated to the specific claims upon that property. It is undoubtedly true in railroad foreclosures that, by the decisions of the supreme court, certain claims have been adjudged preferential and superior to mortgage and secured liens. So far as these rulings have been made this court has unhesitatingly followed them; but it cannot be that the security of a mortgage deed, even if it be a railroad mortgage, is open to displacement by every unsecured creditor. Only the cogent public reasons, which have been so carefully considered and well stated by the supreme court, justify any postponement of the priority of a mortgage debt. So far as I am individually concerned I am unwilling to go a step beyond the matters and rules laid down by the supreme court. As to all outside of those matters I believe the sacredness of mortgage obligations should be observed, and that secured debts should be given the priority which the contracting parties awarded to them. In that view the claims of the intervenors in respect to the Quincy road and the St. Joseph & St. Louis road are without foundation, and the exceptions to the master's reports will be overruled.

With respect to the claim of George I. Seney, the trustee in the mortgage upon the Clarinda Branch, a somewhat different state of facts existed. On June 28, 1884, upon the petition of the receivers and the representations by them that the Clarinda Branch was important to the system, and had earned more than operating expenses, the master recommended an order, which was duly entered by the court, as follows:

"It is ordered that, until otherwise directed, the receivers herein, from the incoming rents and profits of said property, after meeting such other obligations as they have been directed to discharge by the former orders of this court, pay as the same shall from time to time mature, from whatever balance may remain in their hands, * * * on the first days of February and August (or as soon thereafter as practicable) the semi-annual interest at six per cent. per annum, then due on two hundred and sixty-four (264) bonds of one thousand dollars each, issued in July, 1879, and secured by mortgage on the Clarinda and St. Louis Railroad, (otherwise known as the Clarinda Branch,) amounting to $7,920."

The intervenor, though made a party defendant, entered his appearance, and first became a party to the proceeding on January 4, 1885. He was notified by the receivers of an application for a new order in respect to the Clarinda Branch, which was entered upon April 16th. The rental was in fact paid to August 1, 1884. Now, the rental from August 1, 1884, to April 16, 1885, stands, we think, upon a different footing. There was an express order of the court in reference to that branch, and couched in such language that the intervenor had a right to rely upon it, and expect the payment of his rent, until some other order was made. Wherever a specific order is entered after showing and petition by the receivers, it would seem as though the party stood upon a different footing, and was not called upon to assert his rights as lessor to the surrender of the leased property. Whatever might have been the reasons, and however much mistaken the receivers may have been, they acted upon their best judgment, and the court seems by that order to have given express assurance to the intervenor that the interest of the system required the

payment of that rental, and the preservation of that property in the system; so that the order will be that the exceptions to the report of the master will be partially sustained, and the receivers directed to pay the rental for the time specified with interest.   So far as the subsequent rental is concerned there is nothing to distinguish this case from the other two heretofore considered, and the report of the master will be sustained.   It is unnecessary to add more.   We have had these matters under consideration for some months, and have given to them the most careful consideration.   The arguments and briefs of counsel have been most full and elaborate, and the questions presented not easy of solution. The amounts in each case are so large that if our conclusion is erroneous, a review may be had by the supreme court.

THAYER, J.   I shall only add a few words to what has already been said.   We are asked by the intervenors to make an order in this matter the practical effect of which will be to give an unsecured claim priority over a mortgage debt.   As there are no funds at our disposal derived from the income of the property lately in the hands of the receivers, if we allow the claims in the desired form we must enforce payment out of the mortgaged property by retaking it, unless the purchasers under the mortgage see fit to discharge the lien which we impose.   It is proper, therefore, that we should consider carefully both the legal and equitable grounds upon which such action can be predicated and justified.   No lawyer would, for a moment, doubt that an assignee in bankruptcy would be liable for rent if he took possession of leasehold premises held by the bankrupt, and used them for the purpose of administering on the assets in his hands.   In that event the assignee would become personally bound by the covenants of the lease, so long as he remained in possession, and the court would be bound to protect him against the covenant to pay rent, by allowing him for all rent, disbursements as an expense of administration.   *In re Merrifield*, 3 N. B. R. 98, and *People* v. *Insurance Co.*, 30 Hun. 142.   The same principle holds good, of course, in its application to public liquidators under the English Winding Up Acts, and receivers of copartnership estates and the like.   *In re Colliery Co.*, 21 Ch. Div. 330; *In re Granite Co.*, L. R. 6 Ch. 462; and *Com.* v. *Insurance Co.*, 115 Mass. 278.   If such officers use property held under lease for the purpose of advantageously administering on property committed to their charge, they must pay rent as stipulated in the lease, and the amount paid is an expense of administration, and is chargeable against the fund undergoing administration.   The rule as applied in such cases has never operated, however, so far as we can find, to disturb the priority of claims, —that is to say, so as to give an unsecured debt a preference over one that is secured.   It is also well settled that if mortgagees, in a proceeding to foreclose a mortgage, procure the appointment of receivers, and cause them to take possession of property held under lease by the mortgagor, to which their mortgage does not extend, they thereby bind the mortgaged property for the payment of rent that accrues, so long as the receiver remains in possession.   Such was the rule applied in the case of

*Woodruff* v. *Railway Co.*, 93 N. Y. 609; *Miltenberger* v. *Railway Co.*, 106 U. S. 286, 1 Sup. Ct. Rep. 140. The principle which underlies all of the cases cited appears to be substantially the same; that is to say, if an assignee in bankruptcy, public liquidators, receivers of insolvent corporations, or receivers appointed under proceedings to foreclose mortgages, take possession of the property of a third party, held under a lease, and use it ostensibly for the purpose of administering advantageously on the assets in their hands, or at the instance of, and for the benefit of, mortgagees, full rent must be paid for the use of such property, out of any funds within the control of the court, and that without reference to the question whether the use of the leased premises proves to be beneficial or otherwise. There is, in fact, no difficulty in deciding what the law is. The difficulty lies in making a correct application of it to the particular case under consideration; or rather it lies in determining whether the present proceeding was of such an exceptional character that the principle invoked to establish the liability in question is applicable.

Attention has already been called to the fact that the bill in this case was filed by the mortgagor, against all persons and corporations, including the lessors, who were interested in the various roads forming the complainant's railroad system. As I understand the bill of complaint, the complainant professed to be acting, not alone in the interest of mortgagees, but in the interest of all the corporations, whose roads had become an integral part of the system, whether by lease, consolidation, or otherwise. It was substantially represented by the bill that the affairs of the complainant had become so complicated, by the various mortgages that had been executed, the consolidations that had taken place, and the leases made or assumed, and by the admixture of rolling stock, that the best interests of all parties concerned demanded the appointment of receivers over the whole system, as the only feasible method of working out the equities appertaining to each. It was on account of such representations that the receivers were appointed and ordered to take possession of the whole system. In other words the receivership was not created for the benefit or protection of any one interest, or class of interests, but for the benefit of all parties to the suit who were in anywise interested in the system. The lessor companies, whose roads went into possession of the receiver, were advised of such facts by the form of the bill, and by the prayer for relief. They were at liberty, at any time after it was filed, to show that the extension of the receivership over the leased lines was not necessary to the protection of any interests of the lessor companies, or that it was detrimental to such interests. If such showing had been made, (and it appears to me that the lessor companies were cited into court to confess or deny the averments of the bill in that behalf,) the leased lines would unquestionably have been released at any stage of the proceeding. Intimations to that effect, and of the theory on which the court was proceeding, appear to have been given during the progress of the case from time to time. But so long as the lessor companies acquiesced in the averments contained in the bill, and on the faith of which receivers were appointed, it appears to me that the re-

ceivership continued to stand for their protection, and for the protection of the interests of all persons and corporations who were parties to the proceeding; and that, so long as that state of affairs existed, the relative rights of the parties were not changed, and that the mere possession by the receivers of the leased lines did not have the effect of making the rentals a charge on the body of the mortgaged property, superior in rank to the mortgage debt. The case, as I conceive, bears some analogy to the case of the *Bridge Water Engineering Co.*, 12 Ch. Div. 181, where, inasmuch as a public liquidator had retained possession of rented premises for the mixed accommodation or benefit of the landlord and the liquidator, the chancellor refused to allow the rents as a part of the cost of administration. The question before us should not be determined, in my opinion, with any reference to the question whether it was in fact necessary for the protection of the interests of the lessor companies to extend the receivership over the leased lines, although, if we were at liberty to consider that matter, it seems probable, in view of the condition of one of the leased roads, that if it had not been taken in hand by the receivers it would have suspended operations, for a time at least, and put the public to great loss and inconvenience, even if it had not incurred a forfeiture of its franchises. But, be this as it may, the question is not to be determined by considering whether the representations of the bill were erroneous in so far as the leased lines were concerned. We must consider what the bill did in fact allege; upon what theory it was drawn; and for what purpose the court appointed receivers, and for whose benefit; and whether, in the light of such facts, and the subsequent acquiescence of the lessor companies, they can now legally or equitably insist that, because the receivers took possession of their road under an order of court, the rentals which accrued during the period of such possession must perforce take precedence over the mortgage debts, although such leased lines during the period in question did not pay operating expenses. In my opinion, this question must be answered in the negative. The case is so exceptional in its character that the principle invoked to establish the liability in question, in my judgment, is not applicable.

In the course of the argument something was said about the receivers having exercised an election to take possession of the leased lines. On the one hand it was argued that, as they elected to take possession, they became personally bound as assignees of the lease by all its covenants. On the other hand it was argued that they acted under the orders of the court, and exercised no election or discretion. It appears to me that the receivers did not elect to take the leased lines in the sense in which that term is used in the books, but at the same time I do not regard the question as to whether their action was voluntary or enforced as at all material. They had possession of the leased lines, and operated them. If the court ordered them to take possession of the same for the benefit of any particular interest or class of interests involved, and without any reference to the protection of the rights of the lessor companies themselves, then those interests for whose advantage the leased lines were taken and operated by the receivers should stand the expense of the

rental, and the court would be bound to so order. The court has no more right than an individual to use one person's property for the exclusive benefit of another without paying for its use. But from the record and proceedings in this case it does not appear to me that any property was so taken and used. The entire system was taken in hand at the instance of the general owner to protect the interests of all parties concerned. The court, through its receivers, at all times adopted that line of policy which seemed to be conducive to the best interests of all parties as then foreseen. Among other things done for the protection of all parties to the litigation, at an early day it made an order to prevent the earnings of the numerous roads composing the system from becoming confused. It appears to me that such order, so far as it related to the leased lines, was a most explicit avowal that the court did not regard the rentals that from time to time accrued as an expense of administration, and that it did not regard the receivership as having been created for the benefit of the mortgagees, or any particular class of creditors, but for the mutual advantage of all parties concerned, the lessor companies included.

In conclusion I will add that in any light in which I have been able to view the question, it appears to me that the report of the master should be confirmed in the respects indicated in the main decision, and I accordingly concur in the order already announced.