CENTRAL RAILROAD & BANKING CO. OF GEORGIA v. FARMERS' LOAN & TRUST CO. et al. FARMERS' LOAN & TRUST CO. v. CENTRAL RAILROAD & BANKING CO. OF GEORGIA et al. BROWN et al. v. SAME.

(Circuit Court, S. D. Georgia. March 27, 1897.)

1. RAILROAD RECEIVERS—LIABILITY FOR RENT OF LEASED LINE.

Where receivers appointed to take charge of railroad property took possession of a leased line, and operated it for 18 months, keeping no separate account of its earnings and expenses, but applying them for the benefit of the entire system, of which it was treated as an integral part, and the rent which fell due a few days after the appointment of the receivers was paid by them with the sanction of all parties, and the several bills under which the receivers were appointed, and the orders of court made thereon, looked to the maintenance and full preservation of the entire system, including leased lines, and the lessor was not proceeded against as an insolvent corporation, these facts, in connection with the judicial admissions from time to time that the rent which became due more than a year after the appointment of the receivers was a debt which they were required to provide for, require that the rental for the entire period during which the receivers were in possession should be treated as a receivership obligation, contracted under the authority of the court.

2. LIABILITY OF PURCHASERS AT FORECLOSURE SALE FOR RECEIVERSHIP DEBTS.

When the reorganization scheme carried out by the foreclosure of a railroad mortgage contemplated and included all the benefits of a receivership which existed at the time the foreclosure bill was filed, as well as of the receivership instituted under the bill, the mortgage bondholders having the full benefit of all the earnings and advantages of the receivership, and the decree of foreclosure expressly stipulated that the purchasers should take the property subject to all receivership debts and the decree affirming the sale contained the same stipulations, the purchasers are liable for the rental of a leased line which was taken possession of by the receivers, that being a receivership obligation.

Intervention of the Eatonton Branch Railroad Company on exceptions to the master's report.

Charles Nephew West, for the Eatonton Branch Railroad Co.

Lawton & Cunningham, for the Central Railroad & Banking Co. of Georgia.

PARDEE, Circuit Judge. On the 1st day of April, 1853, the Central Railroad & Banking Company of Georgia, hereinafter called

the Central, leased the Eatonton Branch Railroad, a railroad line running from Milledgeville to Eatonton, both in the state of Georgia. The lease was made for the term of the charter of the said Eatonton Branch Railroad Company under certain terms not necessary to mention, except that the Central agreed to pay as rental to the Eatonton Branch Railroad Company the sum of $14,000 per annum on the 1st day of April, 1854, and thereafter on each succeeding 1st day of April. Under this lease the Central took possession of the railroad, and thereafter operated the same as a part of its own property, keeping no separate accounts of the same, and paying the stipulated rent regularly until the matters occurred hereinafter set forth.   On March 4, 1892, Rowena Clark, a stockholder of the Central, filed her bill in this court assailing the validity of a certain lease made by the Central of its entire railroad and property to the Georgia Pacific Railroad Company, under which lease the Richmond & Danville Railroad Company was then operating and controlling the same.   She also assailed the legality of the control exercised over the Central by the Richmond & West Point Terminal Railway & Warehouse Company, by means of a majority of shares of Central stock owned by it.   The bill prayed for the cancellation of the lease; injunction against the continued use of the said majority of stock; for an injunction and a receiver.   As detailed in the bill, the object of the same was to protect the Central and to preserve its autonomy.   On this bill the court issued a temporary injunction, and appointed E. P. Alexander a temporary receiver, directing him to make no change in keeping the Central's books.   On subsequent hearing, March 28, 1892, the court appointed receivers with the usual powers granted to receivers of railroads, directing them to take and operate the property pending a reorganization of the board of directors of the Central, and generally providing for the maintenance of the Central system.   Under the orders made in this case the Eatonton Branch Railroad, as an integral part of the Central system, was taken into possession by the receivers, and operated by them in the same manner as the Central had done since the lease was made.   On the 1st day of April, 1892, default was made by the receivers in the payment of the rental which accrued on that day; whereupon the Eatonton Branch Railroad Company at once intervened, asking for payment of the rental, and the receivers paid it.   Whether this payment was made by specific order of the court does not appear, but it was evidently with the approval and sanction of all parties.   On July 4, 1892, the Central filed its bill against the Farmers' Loan & Trust Company of New York City, the Central Trust Company of New York, and a number of railroad corporations, in which bill was set forth the proceedings in the Rowena Clark Case above mentioned, a description and list of all the railroads and assets and property of the Central, including its leasehold interests in other railroads, stating therein that the Central controls and operates as a part of its system the Eatonton Branch Railroad, and declaring the terms of the lease, including the amount of rental agreed to be paid, but not making the Eatonton Branch Railroad party to the bill.   This bill averred that the Central is now insolvent, in the sense that it is unable to meet its maturing obligations, but that if the in-

tegrity of its system is maintained, and its properties and interests preserved, until a proper plan of reorganization can be effected, it can be re-established upon a sound basis and restored to prosperous conditions. To accomplish which, however, the immediate interposition of a court of chancery is absolutely necessary for the purpose of protecting the integrity of the system, and saving it from disintegration, and preventing the serious and irreparable losses that the disruption would entail upon the stockholders, creditors, and other persons interested in the property. The bill prayed that all of the property and assets of the Central be taken in charge by a receiver to be appointed by the court, to be administered as a trust fund for the stockholders and all interested; that the receivers first pay current expenses of maintaining and operating the Central and steamship lines and other properties, and all labor, supplies, and rentals, and such other charges as are necessary to be made in order to prevent the forfeiture of the Central's rights and interests in the properties which constitute its said system, etc. Under this bill, on July 15, 1892, the court discharged the receivers under the Rowena Clark bill, and appointed H. M. Comer sole receiver, and, in and by this order, the court directed that the receiver assume and pay all the liabilities and expenses incurred under the Rowena Clark receivership, take possession and charge and control of said corporations named in the bill, and other property and assets of every kind, operate the same, and take possession, charge, and control of all the railroads and steamship lines and railroads and steamships owned, leased, or otherwise controlled and operated by said Central Railroad & Banking Company, and manage and operate the same, etc., under the order and protection of the court, having and exercising all the rights and franchises belonging or appertaining to said corporations, to the end that the integrity of the Central Railroad system may be preserved. The order authorized the receiver, after defraying operating expenses, to pay out of the net earnings the rentals and other fixed charges accruing to other companies, or resulting from the uses or operations of other lines and property as a part of said system, and all the corporations named in the bill were restrained and enjoined pendente lite from in any wise interfering with the receiver's possession. The order further provided that all liabilities and expenses incurred under the receivership under the bill of Rowena Clark should be assumed and paid by the receiver then appointed. That this order was not ex parte is shown by the following recital therefrom:

"The following defendant corporations appeared and submitted their answers, signifying their desire that said H. M. Comer, the receiver appointed in and by said order of July 4th, be continued as permanent receiver, viz. the Ocean Steamship Company of Savannah, the Montgomery and Eufaula Railway Company, the Savannah and Western Railroad Company, the Port Royal and Augusta Railway Company, the Port Royal and Western Carolina Railway Company, and the Savannah and Atlantic Railway Company. The defendant the Farmers' Loan and Trust Company of New York also appeared by their counsel, Turner, McClure & Rolston and George A. Mercer, Esq., and filed their answer assenting to the continuance of said receivership. The defendant the Central Trust Company of New York, which is also a party defendant in the original cause of Rowena M. Clark et al. v. the Central Railroad and Banking Company of Georgia et al., and which has duly appeared in said cause, and

which has also been duly served, in accordance with the order of this court, by the United States marshal for the Southern district of New York, with a notice of this hearing and with a copy of said order of July 4th, has failed to appear at this hearing and made no objection to the continuance of said receivership. The counsel for complainants in said original bill of Rowena M. Clark also appeared and participated in this hearing. It appears, further, to the court at a meeting of the board of directors of the Central Railroad and Banking Company of Georgia, held on said July 4, 1892, in the city of Savannah, a resolution was unanimously adopted approving and ratifying the filing of the bill of complaint in this case, and requesting the continuance of said H. M. Comer as permanent receiver. It further appears to the court that other holders of a large amount of the securities and obligations of the Central Railroad and Banking Company, and others largely interested therein, have likewise signified to the court their desire for the appointment of said H. M. Comer as permanent receiver."

Pursuant to above order, the receiver took possession of the Central system, including the Eatonton Branch Railroad, and operated the Branch Railroad as a part of the main line of said system, but, as had been theretofore the practice of the company and former receivers, kept no separate accounts of the earnings and operating expenses of said Eatonton Branch Railroad.   After various pleadings not necessary to notice, on February 20, 1893, the Farmers' Loan & Trust company on leave of the court filed its bill for foreclosure and for the appointment of a receiver, particularly making a party thereto the Central Trust Company of New York as trustee of the second or consolidated mortgage bonds.   This bill showed that the mortgage held by the Farmers' Loan & Trust Company covered all the railroad, and also all the property and assets, of the Central Railroad & Banking Company of Georgia.   It averred that the Central's auxiliary lines held under leases were a part of the property mortgaged, and all should be sold together.   It recited the receivership under the bills of Rowena Clark and of the Central Railroad & Banking Company, and an order of court directing the receiver to take charge of the leased lines, mentioning by name the Eatonton Branch Railroad, and describing it as extending from Milledgville, Ga., to Eatonton, Ga., averring that the Central controls and operates it as a part of its system under lease; and after specifying all of the property, including the leasehold interest of the Central, it avers that all the property described, and each and all and every of them, and the interest of the Central therein, are subject in all respects to the provisions of the mortgage held by the Farmers' Loan & Trust Company, and are part, and constitute part of, the subject-matter of said mortgages, and are and constitute part of the security pledged by the said mortgages and deeds of trust of the said bonds of the Central Company.   It averred default of the Central, the inadequacy of the security, and, then, that the mortgaged property and premises are so situated that they cannot, nor can any part thereof, be sold in parcels without great injury to the interests of the beneficiaries under your orator's trusts.   After other suitable allegations and prayers looking to a foreclosure and sale, the complainant prayed for a receiver, as follows:

"Until such sale can be had, and the proceeds thereof distributed, your orator is likewise advised and charges that it is expedient and necessary that the franchises, property, premises, and appurtenances so mortgaged to your orator in trust as aforesaid, and all the rights, franchises, and property of the Central

79 F.—11

Company, of whatever name, nature, and description, including all its money on hand, and the earnings of the same, and all the rights, franchises, and property of the Southwestern Railroad Company of Georgia, of every kind and description, be placed in the hands and under the control of a receiver to be appointed herein by this court, with such proper powers as are right and equitable to be conferred, such receiver to be the same person appointed in like manner by the other courts having jurisdiction of portions of the mortgaged property, respectively."

Upon this bill the court ordered that "Hugh M. Comer, the receiver of the court under the litigation now pending in said court, be, and he is hereby, appointed temporary receiver under the above bill. This appointment is cumulative and supplementary to the orders heretofore made, and is not intended to vacate or affect any previous order." On May 1, 1893, the Central Trust Company of New York answered the bill of the Farmers' Loan & Trust Company, and, among other things therein, admitted as true the proceedings and orders of court as alleged in the bill under which the leased property was taken possession of and operated by the receiver, but the Central Trust Company alleged that the court had no jurisdiction over the suits in which said orders were passed, but did not set out wherein the defective jurisdiction, if any, existed. The answer contained other matter not necessary to recite. Some other bills and answers were filed, and many interventions, and there was much litigation; but on January 4, 1894, a consolidation having been previously ordered, a decree of foreclosure was rendered in favor of the Farmers' Loan & Trust Company on its mortgage and deed of trust, and therein it was specifically recognized and decreed that included in the property owned by the Central Railroad & Banking Company, subject to the lien of the mortgage to the Farmers' Loan & Trust Company, was the leasehold interest of the Central in and to a certain lease of the Eatonton Branch Railroad, extending from Milledgeville, Ga., to Eatonton, Ga., the lease being dated April 1, 1853, all of which, with other property of the Central, was ordered sold to satisfy the mortgage held by the Farmers' Loan & Trust Company. At the same time the above decree was rendered, leave was given to the Central Trust Company of New York to file a cross bill to foreclose its claim and mortgage on the Central's properties. This cross bill, subsequently filed and prosecuted, was brought in the interest of and pursuant to a new reorganization scheme fully set out in the record. This reorganization scheme contemplated taking advantage of all the beneficial contracts made by the receiver, particularly in regard to the collateral, which included the issue of bonds secured by the mortgage to the Central Trust Company of New York, and of all the earnings and improvements made during the receivership; and therefore provided that the purchasers under said agreement at the sale to be procured by foreclosure of the Central Trust mortgage should pay all the expenses of the main-line receiverships and foreclosure, and allowed preferential claims after application of all funds in the hands of receivers available therefor, and in like manner the debts and preferential claims of the receiverships of any other lines embraced in the plan. On August 26, 1895, on the said cross bill and pleadings thereto, the court passed a final decree of foreclosure in favor of said Central Trust Company, which provided

that, in case of further default, the said Central Railroad be sold in one parcel, without valuation, appraisement, redemption, or extension, and that, of the price for which the property be sold, $50,000 should be paid in cash, and upon the confirmation of same, and from time to time thereafter, such further portions of the purchase price should be paid in cash as the court should direct, in order to meet the expenses of foreclosure and sale and allowed preferential claims; and, further, that upon confirmation of the sale, the approved purchaser or purchasers should take the property purchased subject to the lien, if any, of all debts, obligations, and liabilities of the receivership heretofore or hereafter to be lawfully incurred by or under the authority of the court, or arising under the operations of said railroad, and subject also to the lien of any and all claims heretofore filed in this cause, or in the causes consolidated herein, which the court has allowed or adjudged, or shall hereafter adjudge, to be prior in lien or superior in equity to said consolidated mortgages hereby foreclosed and ordered to be paid.

Under this decree of foreclosure a sale was made to Samuel Thomas and Thomas F. Ryan, which sale was confirmed by the court, October 17, 1895; the said decree of confirmation reciting that the sale was subject, however, to all the decrees, mortgages, liens, receiver's debts, and preferential claims, and to all equities reserved, and to all and singular the conditions of purchase, as recited in the final decree aforesaid, and the continued right of the court to adjudge and declare what receiver's or corporate debts were prior in lien or in equity to the lien of the consolidated mortgage foreclosed, or ought to be paid out of such proceeds and sale in preference to the bonds secured thereby; and the court expressly reserved for future adjudication, with the power thereby to bind the property sold, all liens and claims and equities specified and reserved by the final decree of foreclosure of August 26, 1895. Prior, however, to the foreclosure proceedings aforesaid, and on April 24, 1893, the Eatonton Branch Railroad filed in the case of the Central against the Farmers' Loan & Trust Company an intervention pro interesse suo, asserting that the contract rental due April 1, 1893, on the lease of the Eatonton Branch Railroad Company, was unpaid, and praying an order of the court that the receiver should pay the same. This intervention was permitted by the court, and the Farmers' Loan & Trust Company and other parties defendant to said cause ordered to show cause, on the 1st day of May, 1893, why the prayer in the intervention set forth should not be granted, and directing service upon the several parties.

On May 1, 1893, on leave of the court, Alexander Brown & Sons and others, claiming to be owners and holders of bonds of the Macon & Northern Railroad Company,—which, both as to principal and interest, were guarantied by the Central,—filed their alleged dependent bill, making parties defendant thereto all of the parties to the previous litigation, and, in addition, the several leased and operated lines, including the Eatonton Branch Railroad Company. This bill attacked a certain reorganization scheme as prejudicial to the creditors of the company, and particularly attacked the conduct and management of the receiver in the litigation and the oper-

ation of the property, substantially charging that the earnings of the properties had not been applied to the payment of the proper obligations of the company permitting defaults to be made in certain interest charges guarantied by the Central, and in rentals, particularly averring as follows:

"Your orators show that in addition to certain defaults said Central Company has defaulted in the payment of the rental due * * * to the Eatonton Branch Railroad, * * * and that, by reason of said several defaults, said Central Company is in danger of forfeiting its control of said properties, which are valuable as adjuncts and part of its said system, while remaining bound to pay the debts and obligations for which it has become liable either as principal or guarantor under said several leases."

The bill, among other things, prayed for removal of the receiver, and the appointment of a new receiver of the Central, and of all the leases and operated railroads connected with the Central system, to operate the same as an entirety, to prevent the disintegration of the said Central system of railroads. To this bill the receiver made answer, admitting the default in the rental due to the Eatonton Branch Railroad Company, but averring the same not intentional or premeditated, or made for any other reason than that the money required for the payment of the coupons and rentals had not been earned. No action appears to have been taken upon the intervention of the Eatonton Branch Railroad Company, but on June 30, 1893, the court passed an order directing the receiver to report to certain corporations whose properties were under lease to the Central, to wit, the Southwestern Railroad Company, the Augusta & Savannah Railroad Company, the Mobile & Girard Railroad Company, and the Eatonton Branch Railroad Company, the amount of earnings which had come into the hands of the receiver from the operation of the said leased lines from March 4, 1892, to date, or as near thereto as practicable, and showing the amount of expenses incurred by him in the operation of the same, and the amount of disbursements for their account during the same period. The order further provided that, within 30 days from the receipt of the report by the respective corporations, the said corporations should make known to the receiver and to the court whether they desired to permit said properties to remain in the hands of said receiver as representing the lessee company, with the right on the part of said corporations, or either of them, to claim the net results of the operation of their respective properties up to the rental contract, but not beyond, or whether the said corporations shall receive from the receiver the surrender of the leasehold interests held by him as receiver of the Central Railroad & Banking Company of Georgia; further, that, if any of said companies should make known their option to receive the surrender of the leasehold interests as aforesaid, the receiver should immediately apply to the court for an order authorizing and directing him to surrender the same; and, further, provided that, should any of the said companies elect to permit the leasehold interest to remain in the hands of the receiver, said companies shall have the right to claim from the court the net result of the operations of their properties by the receiver up to the

rental contract price, and no more, unless the receiver should, under order of the court, elect to retain the said leasehold interest, and pay therefor the rental contract price.

Under this order, and on August 14, 1893, the receiver made his report to the Eatonton Branch Railroad Company, showing an estimate of earnings and expenses of the said railroad from March 4, 1892, to June 30, 1893, to wit: Earnings, $16,599.04; expenses, $17,037.15; net loss from operation of property, $438.11. In his report the receiver says that the statement is only an estimate; that the earnings and expenses of the Eatonton Branch Railroad—the road being leased for a fixed sum, and being very short—have never been kept separate from the earnings and expenses of the main stem of the Central Railroad & Banking Company of Georgia, and therefore an exact statement of all receipts and disbursements for account of this piece of road cannot be given. The estimate, however, has been carefully made by the auditor for the receiver, and is believed to be as nearly correct as practicable. In relation to this report the receiver testifies that no separate account of earnings and expenses had been kept up to the date of the order of June 30, 1893; that he has no positive recollection of the matter, but his impression is that the estimate was made by prorating on the basis of the business that came from and went to that road. He thinks he discussed the matter with the comptroller at the time of the order of June 30th, as to how to arrive at a satisfactory division of the earnings of that road, and his impression is that it was done on a basis of prorating according to the mileage. He further testified that he was a director of the Central Railroad Company from 1883 to 1887, and again in 1889, and he does not think that any report was ever made as to the earnings of the Eatonton Branch Railroad. He did not remember ever seeing one or hearing it discussed, or seeing a statement of its earnings, or hearing that it had not earned its rental. On this report the Eatonton Branch Railroad Company elected to retake possession of its road on September 25, 1893. The receiver applied to the court, and obtained an order to surrender the road to the company. Under this order the receiver moved off the leased road all the property of the Central Railroad Company, including tools and cross-ties not in the track, and gave up possession of it October 1, 1893. On February 6, 1894, the Eatonton Branch Railroad Company presented an amendment to their original intervention, setting forth all the facts in the case with regard to their claim for rental from the 1st day of April, 1892, up to the 1st day of October, 1893, with certain exhibits and documents, to the Honorable Howell E. Jackson, circuit justice, then presiding in the circuit court, who entered thereon the following: "This application is denied. The funds and assets being administered are not liable for the rental claimed, and it would be idle and useless to direct a reference about the matter." The application being thereafter renewed, the court on November 24, 1894, granted leave to file the intervening petition, and for the Eatonton Branch Railroad to amend its original intervention as prayed. This intervention, as amended, was subsequently referred to a special master, who, after

taking evidence covering the whole record of the Central litigation and much additional, reported, among other things, "that the intervener is entitled to a judgment for the amount due for rent and interest on the same, and I find in its favor for the sum of fourteen thousand dollars and interest from April 1, 1893, and the further sum of seven thousand dollars and interest on the same from October, 1893"; and, further, that "the claim is not one which is entitled to any priority in the distribution of the assets of the Central Railroad & Banking Company of Georgia."

Many exceptions have been filed to this report, and I have heard argument on the same, but the view I take of the case renders it unnecessary to consider them in detail.  On the facts as above recited, in connection with the many cumulative circumstances and admissions found in the record not necessary to specifically point out, I find that the rent due the Eatonton Branch Railroad under the lease to the Central, for the time the Eatonton Branch Railroad was held and operated by the receivers, to wit, from April 1, 1892, to October 1, 1893, was, and is, a debt of the receivers, as an expense necessary to the administration and operation of the railroad properties taken into the possession of the court under the several and respective bills of Rowena Clark against the Central Railroad & Banking Company et al., the Central Railroad & Banking Company et al. against the Farmers' Loan & Trust Company et al., and the Farmers' Loan & Trust Company against the Central Railroad & Banking Company et al., all of which bills, and the orders of court made thereon and thereunder during the period for which the rent is claimed, look to the maintenance and full preservation of the entire Central system; in fact, the first two named bills appear to have not much, if any, other equitable foundation.  Considering the declared objects of the several bills, and the orders of court made thereunder; the fact that the receivers kept no separate accounts of the earnings and expenses, the receipts and disbursements, of the Eatonton Branch Railroad, applying the earnings of said branch for the benefit of the entire system, treating the said Branch Railroad as an integral part of the Central; the manner in which the receivers otherwise dealt with the property; the payment of the rent due April 1, 1892; the judicial admissions from time to time that the rent due April 1, 1893, was a debt and obligation which the receivers were required to provide for,—it seems clear that, in equity and good conscience, the rental due must be declared to be a receivership obligation contracted under the authority of the court.  From an examination of Central Trust Co. v. Wabash, St. L. & P. Ry. Co., 34 Fed. 263; Park v. Railroad Co., 57 Fed. 799; New York, P. & O. R. Co. v. New York, L. E. & W. R. Co., 58 Fed. 280; Ames v. Railway Co., 60 Fed. 971; Central Trust Co. of New York v. Charlotte, C. & A. R. Co., 65 Fed. 264; Quincy, M. & P. R. Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787; Railroad Co. v. Humphreys, 145 U. S. 105, 12 Sup. Ct. 795; United States Trust Co. v. Wabash W. Ry. Co., 150 U. S. 287, 14 Sup. Ct. 86,—I conclude that the present case is not controlled by any of them, but is within a clear equity recognized in most of them.

In Quincy, M. & P. R. Co. v. Humphreys, supra, it is said:

"Where a receiver appointed to take charge of railroad property takes possession of a leased line, and operates it for a reasonable time, keeping separate accounts, diverting none of its earnings to the benefit of the general system or its creditors, and with an express recognition on the part of the court appointing him of the right of the lessor to resume possession on making proper application therefor, he does not become the assignee of the lease, or adopt it so as to render the agreed rental a lien on the earnings of the general system superior to that of the mortgages thereof. Nor was the rental an expense originating in the course of the receiver's administration, and entitled, as such, to priority over the mortgage lien."

In Railroad Co. v. Humphreys, supra, it is said:

"The receiver of an insolvent railroad corporation, originally formed by the consolidation of two separate companies, does not, by virtue of his appointment, become the assignee of a branch-line lease executed to one of the companies before the consolidation; and where the income of the leased line is insufficient to pay the operating expense, and it is also unprofitable as a feeder or connection, the property of the consolidated corporation should not be taken without the consent of its creditors, for the purpose of paying the rental of the leased line. Where the accounts of an insolvent railroad corporation had been so kept as to render it impossible to ascertain the net profits or loss incident to the operation of a leased line, and from the nature of the case the receiver could not begin to ascertain its unprofitable character inside of three months from his appointment, he cannot be held to have adopted the lease, because he failed for nine months after his appointment to formally notify the lessor that the rent would not be paid, especially when the order of court appointing the receiver directed the payment of rental on leased lines 'out of the income' of such lines."

The subject was again considered in United States Trust Co. v. Wabash W. Ry., 150 U. S. 287, 14 Sup. Ct. 86, and the conclusions summarized were:

"A railroad receiver, even though appointed on the petition of the railroad company itself, and for the express purpose of preventing the disintegration of the system, does not become liable for rentals upon leased lines, eo instanti, by the mere act of taking possession, but he is entitled to a reasonable time to ascertain the situation of affairs. An order directing railroad receivers to keep divisional accounts, and to pay rentals on leased lines only to the extent of any surplus earned by such lines, respectively, over their operating expenses, is notice to such lines and their mortgagees that they must not expect payment of rentals unless there is such a surplus; and, if they do not then intervene to regain possession of the property, they have no claim on the receivers in the event that there is no surplus."

The present case is sharply distinguished by two salient facts: That the receivers did not keep separate accounts of the earnings and expenses of the Eatonton Branch Railroad, but applied its earnings to the benefit of the system, therein acting under authority of the court; and the further fact that at no time during the possession by the receivers of the Eatonton Branch Railroad, under any of the three bills in which the receivers were appointed, was the Central proceeded against as an insolvent corporation, although in the bill of the Farmers' Loan & Trust Company, filed January 23, 1893, and perhaps in other pleadings, there is an allegation, on information and belief, that the Central was insolvent. At no time during the receivership, nor until the order of June 30, 1893, was there, in my opinion, any action taken which authorized or required the Eatonton Branch Railroad Company to conclude otherwise than that the receiver, under the au-

thority of the court, adopted the lease and would be responsible for the rent. The default in the payment of the rent due April 1, 1893, came nearest to a warning to the Eatonton Branch Railroad to be vigilant in asserting its rights; but that warning should have very little effect, because, when an intervention was filed asking that the receivers be ordered to pay the rent, the obligation was apparently admitted, and other excuses than want of obligation given for the failure to pay.

Having thus determined that the rental due the Eatonton Branch Railroad Company, April 1, 1892, to October 1, 1893, is an obligation of the receivers growing out of their administration, the next question is whether purchasers of the Central property, under the decree of foreclosure and sale rendered in favor of the Central Trust Company of New York, are liable therefor. It is contended, and apparently with justice, under the principles declared in the cases above cited, that mortgaged bondholders not provoking the appointment of receivers, nor benefiting by their administration, cannot be held liable for the expenses of such receivers, nor can such expenses be made a lien on the property administered to the prejudice of prior mortgages. I do not wish to be considered as now holding anything to the contrary, but I do not find that the facts in the present case require the application of the principles contended for. As early as July 4, 1892, the Farmers' Loan & Trust Company, trustee in the tripartite and prior mortgage, and the Central Trust Company of New York, the trustee in the subsequent mortgage under which the Central property was finally sold, were called upon by the court to oppose or consent to the appointment of receivers of the Central property for the purpose of preserving the system as an entirety. The Farmers' Loan & Trust Company appeared and consented to the appointment of a receiver. The Central Trust Company of New York, as recited by the court in the order made July 15, 1892, though duly notified, failed to appear, and made no objection to the continuance of said receivership. The bill of the Farmers' Loan & Trust Company praying for a foreclosure, filed January 23, 1893, claimed that the lease of the Eatonton Branch Railroad was included in their mortgage, and that bill distinctly prayed for a receiver for all the franchises, property, and premises and appurtenances included in the mortgage, and all the rights, franchises, and property of the Central of whatever name, nature, and description, including all its money on hand and the earnings of the same; and on this prayer the court did appoint a receiver, making the same cumulative and supplementary to the orders theretofore made, without opposition or objection by the Farmers' Loan & Trust Company.

From these facts, if the case required, I might, and with reason and some authority, say that the receivership of the Central, from July 4, 1892, was at the instance, and in the interest, of the mortgage bondholders, and that in equity the said bondholders, having thereafter taken full advantage of all the benefits of the receivership, were charged with its expenses (see Farmers' Loan & Trust Co. v. Northern Pac. R. Co., 58 Fed. 264); but I do not find it necessary to put my decision solely upon this ground. The record shows that the reorgan-

ization scheme which was carried out by a foreclosure of the mortgage of the Central to the Central Trust Company of New York, which covered all the rights and franchises and property in the Central system, contemplated and included all the earnings and benefits of the receivership from the incipiency of the litigation; and that, in fact, in the decree of foreclosure subsequently rendered in favor of the Central Trust Company of New York, under which the entire property of the Central covered by the mortgage was foreclosed, it was expressly stipulated that the purchasers at the sale should take the property purchased subject to the lien of any and all debts, obligations, and liabilities of the receivership theretofore and thereafter lawfully incurred by and under the authority of the court or arising under the operation of said railroad; and in the decree confirming the sale, in which Thomas and Ryan were purchasers, and conveyance ordered to be made to them of the purchased property, it was expressly stipulated that the same was subject, however, to all the decrees, mortgages, liens, receivers' debts, and preferential claims, and all equities reserved, and to all and singular the conditions of purchase as recited in said decree, and the continued right of the court to adjudge and declare what receiver's or corporate debts are prior in equity to the lien of the consolidated mortgage herein foreclosed, or ought to be paid out of such proceeds and sale in preference to the bonds secured thereby. Under this decree, and the subsequent decree of confirmation of sale, it cannot be questioned that the purchasers of the property assumed and agreed to pay all the debts and obligations of the receivership prior or subsequent to said decree. Nothing less than this could have been contemplated, because, under the decree and the reorganization scheme, the mortgage bondholders had the full benefit of all the earnings and advantages of the receivership, benefiting particularly by the several contracts and arrangements made by the receivers in relation to the large loan on collaterals made by the Central prior to any receivership, which collaterals were by such contracts preserved to the use of the bondholders.

Other questions have been made and argued on both sides, but I do not find it necessary to consider them further than to say that the alleged plea in bar to the effect that the order of Mr. Justice Jackson on February 6, 1894, refusing leave to the Eatonton Branch Railroad Company to file an amended and supplemental intervention,—which leave to file was subsequently granted,—was a final decree of dismissal upon the merits, and is an absolute bar against the further prosecution of the claim, if the same is seriously pleaded, is not well taken. Neither Gumbel v. Pitkin, 113 U. S. 545, 5 Sup. Ct. 616, nor Savannah v. Jesup, 106 U. S. 563, 1 Sup. Ct. 512, the only cases cited, support such contention. In each case an intervention was filed by leave of the court, and afterwards heard on its merits.

A decree will be entered sustaining the exceptions to the special master's report, so far as the master finds that the Eatonton Branch Railroad Company, for the amount of rental found due, is not entitled to any priority in the distribution of the assets of the Central Railroad & Banking Company of Georgia; and thereupon, no recom-

mittal being necessary to advise the court, the decree will further provide that the amount due the Eatonton Branch Railroad Company as rental aforesaid shall be paid by Thomas and Ryan, the purchasers of the property of the Central Railroad & Banking Company of Georgia at the foreclosure sale under the decree of this court in favor of the Central Trust Company of New York.